In the Matter of **SPECTRUM ARENA, INC., Debtor.**

No. 30437.

United States District Court,
E. D. Pennsylvania.

Aug. 31, 1971.

Sidney Chait, Philadelphia, Pa., for Trustees.

LeRoy E. Perper, Philadelphia, Pa., for ARA Services.

I. Grant Irey, Jr., Philadelphia, Pa., for Fidelity Bank.

Gilbert W. Oswald, Philadelphia, Pa., for Foreman-Snider.

Philip P. Kalodner, Philadelphia, Pa., for Debtor.

IN PROCEEDINGS FOR REORGANI-ZATION OF A CORPORATION UNDER CHAPTER X THE BANK-RUPTCY ACT

HIGGINBOTHAM District Judge.

OPINION

I.

On May 1, 1968, the Spectrum Arena, Inc. (hereinafter referred to as the "Debtor" or the "Spectrum") was involuntarily placed in reorganization under the Bankruptcy Act of July 1, 1898, Chapter X (11 U.S.C. 501, et seq.). Now three years later, after having handled more than $13,000,000.00 in gross receipts, Trustees Harvey N. Schmidt, Esquire and William David Webb, Esquire have so revitalized the Arena's business that there is now a reorganization plan whereby after reorganization all secured and unsecured creditors [1] could be paid

---

1. As to the payment of unsecured creditors, particularly Leonard Tose, see discussion at p. 766, *infra*.

100% and the Arena could become a viable financial entity.[2] To turn around this complex enterprise so that even unsecured creditors can be paid 100% is a spectacular management performance in light of most bankruptcy and corporate reorganization proceedings; for it is indeed rare when unsecured creditors are able to get any substantial payment for their just debts.

Three plans of reorganization have been filed, two of which have been supported with detailed financial data, extensive evidence, stipulations of fact, and legal arguments.

The plan filed, endorsed and *preferred* by the Trustees was proposed by Earl M. Foreman and Edward M. Snider.

(This plan will hereinafter be referred to as the "Foreman-Snider Plan", or the "Trustees' Plan".) Earl M. Foreman and his wife, Phyllis, are the holders of a fourth mortgage on the Spectrum's leasehold interest, which mortgage had a book value as of April 30, 1971, of $1,481,969.76.

A second plan has been filed by Philip P. Kalodner, Esquire (hereinafter referred to as "Kalodner"). He appears in a triple-star role: first, as a proponent of a corporate reorganization plan; second, as a creditor with a claim against the Debtor for approximately $3,000.00 for past legal services; and third, as the present holder of 92% of the issued stock of the Debtor.[3] In all

---

2. Substantial credit should also be given to the effective business manager, Clair Rothman, and the general manager, Harold Freeman, who were appointed by the Trustees. During this three year period, the Trustees were confronted with major management problems, portions of the roof blowing off on two occasions and threatened cancellation of insurance; yet they were able to turn the corner by increasing the gross income for the Spectrum during the last year by at least one-half million dollars. In addition, a net operating loss of $733,366 in the fiscal year ending April 30, 1970 was reduced to $2,250.75 in the fiscal year ending April 30, 1971.

3. At the July 23, 1971 hearings pertaining to the proposed plans for reorganization, Mr. Kalodner, a distinguished member of the Pennsylvania Bar, stated:
"I will cover first my just general background briefly. . . .
"I am first of all the proponent of a plan filed with the court and which I signed.
"In general I have practiced law these past fifteen years, including various business situations in which I have been engaged, and in some more limited areas some work in the tax field, particularly in the tax-legislative field, although somewhat narrow, one particular matter involving an amendment to the Internal Revenue Code.
"I have been active in the last several years with the Curtis Publishing Company where I was briefly the president. . . .
 * * * * *
" . . . And chief executive officer, sir, and I think perhaps it would be a bit

immodest, but over a very difficult period of a few months was somewhat, I think, instrumental in protecting it from and preventing what could have been a bankruptcy during that period of time.
"Specifically covering my background in connection with the Spectrum I was first associated with Mr. Wolman and Mr. Foreman and Mr. Snider as counsel in a number of matters for interests in which they were interested in the City of Philadelphia beginning fairly shortly after their acquisition of the assets of the Philadelphia Eagles Football Team by a corporation called the Philadelphia Eagles Football Club, Inc., in which Mr. Wolman and Mr. Foreman were holders in the year 1964.
"I represented them in a number of matters over several years.
 * * * * *
"I represented Mr. Wolman in connection with negotiations with the City of Philadelphia for the lease for the ground and the building which was to become occupied by the Spectrum Arena, Inc., subsequently." (N.T., July 1971, p. 133–134.)
In addition, Mr. Kalodner stated that he " . . . was involved in the contract with McCloskey [as to the construction of the Spectrum] which I helped negotiate," that he drafted or participated in the drafting of the concession and loan agreements with A.R.A., and that he did some work for Mr. Wolman as to the Philadelphia Hockey Club and the Philadelphia Eagles Football Club, Inc., (hereinafter referred to as the "Eagles"). He also represented Mr. Wolman as to a transfer of certain stocks including those of the

of these roles, Kalodner has acted as his own counsel.

By agreement of April 22, 1971, Kalodner obtained the 920 shares of stock of which Jerry Wolman was the registered holder, and 40 shares of which Kalodner was purportedly the beneficial owner. For the transfer of these securities, Kalodner made no payment in cash and will be obligated to pay Wolman at most $220,000 only if Kalodner receives any "cash proceeds . . . by virtue of the ownership of such shares of stock in the form of dividends or by virtue of the sale of such shares." (Kalodner's Exhibit 1, hereinafter referred to as "K–1". In Wolman's own proceedings for an arrangement under Chapter XI of the Bankruptcy Act, in the United States District Court for the District of Maryland (Case No. 13072), on December 8, 1969, a stipulation was filed by and among Debtors, Creditors' Committee and the Fidelity Bank which provided, *inter alia,* as follows:

> "*Debtors and the Committee hereby agree that Spectrum is insolvent and consent to a finding that the stock of Spectrum owned by the Debtors is valueless.* Furthermore, Debtors and Committee agree that the Debtors have no other interest of any kind in Spectrum or the proceeds thereof." (Emphasis added.)

(Docket Entry No. 166, Exhibit L, p. 2, hereinafter referred to as D.E. 166, Ex.L, p. 2.)

A third plan was proposed by A.R.A. Services, Inc. (hereinafter referred to as "ARA"), holder of a third mortgage on the Debtor's leasehold interest, but that plan is not being presently considered since it does not provide for any payment to unsecured creditors.

To understand either plan requires an analysis of events during the last five years which have been as dramatic, complex and intriguing as any spectator sport or spectacular ever observed within the walls of the Spectrum.

The central figure in this financial drama necessarily is Jerry Wolman; accompanying him on stage as major parties are Earl Foreman, Esquire, and Philip Kalodner, Esquire, both of whom at various times served both as Wolman's lawyer and business associate; his former business partner, Edward M. Snider; and the spouses of Snider and Foreman. The financial intrigue encompasses multiple transactions between the Philadelphia Eagles and Jerry Wolman, the Spectrum and Jerry Wolman, various banks and Jerry Wolman, the City of Philadelphia and Jerry Wolman, Edward Snider and Jerry Wolman, and Earl Foreman and Jerry Wolman. Particularly in view of some of the subsequent findings which are necessarily critical of Wolman's financial conduct from 1965 to 1968, as a matter of fairness it should also be noted that in many ways Jerry Wolman was an individual of excessive generosity to his colleagues and to individuals whom he thought were his friends; he was also generous to the City of Philadelphia in building at his own expense a new modern arena, giving full title to the building to the City, thus saving the taxpayers from any expense for its construction (see earlier Opinion in this case, filed August 9, 1971, 330 F.Supp. 125.) However, the scenario of the last five years also reveals that when Wolman's once apparently substantial financial empire started to crumble, to save those enterprises Wolman for his personal use made several withdrawals involving more than two million dollars from corporations (the Spectrum and the Eagles) which he owned or controlled as a majority stockholder.

From this five year financial milieu two competing detailed reorganization plans have evolved—the Foreman-Snider Plan and the Kalodner Plan. Each Plan starts with significantly different financial assumptions as to the amount of the debt owed by the Debtor corporation. The Foreman-Snider Plan assumes that

---

Spectrum and the Philadelphia Hockey Club.

(N.T., July 23, 1971, pp. 135–139, see p. 8, *infra.*)

the Foreman fourth mortgage (of which book value was $1,481,969.76 as of April 30, 1971) is valid and provides as follows:

"1. *Fourth Mortgage Class (5).* The fourth mortgage on the property of the Debtor shall either be satisfied in consideration of the issuance to the assignee of the holder thereof of shares of stock in the new company, or be wholly subordinated to all debt incurred in financing the Plan and the needs of the new company." (Docket Entry 145 at p. 5.)

The Kalodner Plan makes no financial provision for the fourth mortgage, for Kalodner has filed a petition to strike and disallow said fourth mortgage. Kalodner stated: " . . . there will be nothing before you as to a plan from me if his [Foreman's] claim is not stricken." (N.T., Aug. 19, 1971, p. 93).

After two days of extensive arguments on August 20, 1971, I ruled that the Foreman fourth mortgage is valid and I thereby denied Kalodner's petition to strike and disallow the mortgage. Consequently, since the Kalodner Plan is not adequate to finance the present debt structure, its relative merits need not be discussed. Therefore, as to the Foreman-Snider Plan, the sole issue posed is whether it is "worthy of consideration" for submission to the Securities and Exchange Commission pursuant to Section 172 of Chapter X (11 U.S.C. 572).

Subsequent to my ruling of August 20, 1971, on August 27, 1971, I received a letter from Kalodner (Docket Entry No. 191), providing as follows:

"At our conference late Friday afternoon, I was unable to answer your question with respect to when I might be in the position to file an Amended Plan providing for the payment of the Fourth mortgage in the event my appeal of your ruling is ultimately unsuccessful.

"Since our meeting, I have been engaged in efforts to obtain additional financing which would enable me to provide for the payment of the Fourth mortgage if necessary. As a result of those efforts, I now believe that I will have made such arrangements or have conclusively failed to do so as to the persons with whom I am now working before the end of next week.

"I would, therefore, suggest that I report to the Court on Tuesday, September 7, either by filing an amended plan providing for the payment of the Fourth mortgage, if required, or by advising the Court that I am not in a position to do so.

"In the meantime, I would respectfully suggest that it might be appropriate for the Court to withhold any ruling or opinion with regard to the Plans of Reorganization." [4]

All parties have been granted great liberality in amending their proposals, since my primary concern has been the desire to see all creditors including unsecured creditors paid 100% of their fully valid claims. However, even litigation in corporate reorganization should not be an endless tunnel for the continuous depositing of amended plans. In their commitment letter providing $7,000,000 in financing for the Foreman-Snider Plan, the First Pennsylvania Company warranted no time period for this commitment. ARA has expressly limited its offer wherein a third mortgage and certain debts totaling 1.4 million dollars are subordinated and refinanced for the Foreman-Snider Plan. ARA expressly conditioned its agreement upon (1) the Trustees consummating the reorganization plan by December 31, 1971, including payment in full of the debt owed by Spectrum Arena to the Fidelity Bank, and upon (2) the commitment of the First Pennsylvania Company not being cancelled. (Foreman-Snider Exhibit 3, hereinafter referred to as "F–S 3").

4. By phone call to my law clerk on August 30, 1971, he has advised that a Plan would definitely be submitted.

Thus, I am faced with the reality of a present plan wherein secured and unsecured creditors could be paid in full—as opposed to a request that I defer consideration of the Foreman-Snider Plan so that Kalodner may ascertain whether he can produce a *viable* amended plan with an additional 1.5 million dollars. In fairness to the creditors, I will not defer my adjudication since the present record has already been closed with all parties having had ample time to present their cases. For certainly Kalodner could have long ago anticipated that he might be in error as to his challenge of the Foreman mortgage, and in such a case, he should have made previous efforts to prepare an alternative plan which would provide an additional one and one-half million dollars financing. Accordingly, as to Kalodner's potential future amendment, I make no judgment as to whether at this stage further amendments should be permitted or considered.

This opinion, filed pursuant to Rule 52(a) of the Federal Rules of Civil Procedures (28 U.S.C. Rule 52(a)), constitutes the prerequisite findings of fact and conclusions of law for my prior Order denying and dismissing the petition to strike and disallow the Foremans' fourth mortgage claim, and for my finding that the Foreman-Snider Plan is worthy of consideration for submission to the Securities and Exchange Commission.

## II. STIPULATED FACTS

Almost all facts concerning Kalodner's petition to strike and disallow the Foremans' fourth mortgage have been stipulated and are contained in the Stipulation of Facts (D.E. 165) and the accompanying Exhibits (D.E. 166).

The Eagles were incorporated in 1964 to acquire the assets of the Philadelphia Eagles Football team. Jerry and Anne Wolman were issued 52% of the stock of the Eagles, for which they paid $520,000, and Earl and Phyllis Foreman were issued 48% for which they paid $480,000. Of the money contributed by the Foremans, $280,000 represented a loan from Jerry Wolman to be repaid in five years. (D.E. 165, Stipulation 1, hereinafter referred to as "D.E. 165, S–1).

The Spectrum was organized on May 3, 1967, at which time Jerry Wolman was issued 46% of its stock. On August 12, 1967, Jerry Wolman acquired an additional 46% of the Spectrum's issued stock (D.E. 165, S–2) in a complicated transaction which included Wolman's acquisition of Snider's interest in the Spectrum and Snider's acquisition of Wolman's interest in the Philadelphia Hockey Club, Inc. (N.T., August 19, 1971, p. 25).

From August, 1966 to November, 1967, Wolman caused the Spectrum to transfer funds to him or to others on his behalf. Among such amounts transferred to Wolman were $1,000,000 which the Spectrum had received from ARA on August 19, 1966, and $1,000,000 which the Spectrum had received from the Fidelity Bank in June, 1967. At all times after August 18, 1966, Wolman has owed the Debtor a net balance in connection with such transactions, and on November 6, 1967, this net balance was $1,598,353.66 (D. E. 165, S–4; N.T., August 19, 1971, p. 94.)

From March, 1967 to the Fall of 1967, Wolman at various times caused the Eagles to transfer funds to and on behalf of the Spectrum. By the Fall of 1967, the net balance of such transfers was $443,776.65. (D.E. 165, S–5). Such transfers of funds were done purportedly without authorization from the Board of Directors of the Eagles and without the consent or knowledge of the Foremans. Foreman, by letter of October 21, 1967 (D.E. 166, Ex. C), protested to such transfers of funds by the Eagles to or on behalf of the Spectrum and others for the personal benefit of Wolman. (D. E. 165, S–7.) Furthermore, during 1967, Wolman caused the Eagles to transfer funds to himself or on his behalf totalling more than $1,400,000. (D.E. 165, S–8).

On June 1, 1967, Wolman and Joseph King (an assistant secretary of the Eagles), purporting to act on behalf of

the Eagles, executed and delivered a Guarantee Agreement (D.E. 166, Ex. B) guaranteeing payment of all sums due or to become due to McCloskey & Co., Inc., (hereinafter referred to as "McCloskey") from the Spectrum and Wolman for the construction of the Spectrum's facilities. (D.E. 165, S–6). This Guarantee Agreement was executed and delivered without the authorization of the Board of Directors of the Eagles and without the knowledge or consent of the Foremans. (D.E. 165, S–7.) On learning of the Guarantee Agreement, Foreman protested at the December 26, 1967 Board of Directors meeting that this guarantee had never been authorized, and asserted that the Guarantee Agreement was not a valid obligation of the Eagles. (D.E. 165, S–9; D.E. 166, Ex. F.)

With Wolman filing a Petition for Arrangement under Chapter XI of the Bankruptcy Act on December 13, 1967, and with the Spectrum going into reorganization under Chapter X of the Bankruptcy Act on May 1, 1968, McCloskey was thereafter prevented from proceeding against either Wolman or the Spectrum for collection of the balance due for the construction of the Spectrum's facilities. (D.E. 165, S–10; N. T., August 19, 1971, p. 37.)

In June, 1968, McCloskey filed a complaint against the Eagles in the Court of Common Pleas of Philadelphia County seeking payment of $1,235,740.48 for the construction of the Spectrum's facilities pursuant to the Guarantee Agreement. The Board of Directors of the Eagles, with Wolman present, resolved to resist the McCloskey suit, contending that the purported Guarantee Agreement was not a valid corporate act of the Eagles. (D.E. 165, S–11.)

With both Wolman and the Spectrum in corporate reorganization, a sale of the Philadelphia Eagles at a "good price" was advantageous to both Wolman and Foreman. Through the sale of the Eagles, Wolman would have funds to eliminate some of his indebtedness, and as a result there would be a better prob-

ability of a rearrangement of his personal financial affairs. Kalodner conceded that the sale of the Eagles stock was ". . . obviously of some benefit to him [Wolman]." (N.T., August 19, 1971, p. 101.) Similarly the sale would be advantageous to Earl Foreman in that he was anxious to see the Eagles sold before his equity was lost. Thus, for these mutually advantageous reasons, Wolman and the Foremans entered into a Compromise Agreement as of October 31, 1968, with the following parties: Morgan Guaranty Trust Company of New York (hereinafter referred to as "Morgan"); Jerry and Anne Wolman; McCloskey; Blake Construction Co., Inc. (hereinafter referred to as "Blake"); Earl and Phyllis Foreman; and the Eagles. The Agreement candidly recognized that:

" . . . There are pending disputes among the parties including but not limited to (i) the priority of the distribution of the proceeds of any sale of the Eagles, (ii) a claim of McCloskey as to an alleged guaranty of the Eagles, (iii) the amount of the claims of Morgan and the validity of its security, (iv) the amount of the claims of Fidelity and the relative priority of its security interest in the Eagles stock, and (v) the relative priority of Blake's security interest in certain of the Eagles stock; and

" . . . The parties hereto desire to compromise all such disputes and prevent any further litigation with respect thereto; . . ."

Though the agreement provided that if funds were available from Jerry Wolman's pro rata share, the McCloskey claim would be paid from Wolman's pro rata share, nevertheless, "[I]t was recognized as highly unlikely that on distribution of the proceeds, the satisfaction of all the Wolman debts, including the McCloskey claim could be accomplished from Wolman's 52% share of the proceeds; and that on the contrary, it was likely that the amount representing the McCloskey claim would have to come from the Foreman share. . . . In view of

the fact that by executing the Compromise Agreement, Foreman was relinquishing his claim as to the invalidity of the Guarantee Agreement, it was provided in the Compromise Agreement that upon payment of McCloskey claim, Foreman was to be assigned the McCloskey claim and the mortgage on the leasehold interest of the Spectrum securing such claim. This would apply regardless of whose distributive share might be used to pay the McCloskey claim." (D.E. 165, S–12; D.E. 166, Ex. I.)

On May 1, 1969, the assets of the Eagles were sold and the October 1968 prognosis was confirmed—there were not enough funds from Jerry Wolman's pro rata share to pay for the McCloskey mortgage in the principal sum of $1,235,740.48, plus interest, and, in fact, there were not enough funds to pay certain other priority debts which were to be deducted from Wolman's share if there were funds available. Thus, as a result, "[U]pon the sale of the assets of the Eagles on May 1, 1969, in the distribution of the cash received from the sale, there was distributed to Foreman or paid to his creditors approximately $3,000,000. If the Wolman share had been sufficient to pay the items charged to Wolman in the Compromise Agreement, the Foreman distributive share would have been approximately $5,350,000 . . . At such closing, the McCloskey claim and associated mortgage were assigned to Earl and Phyllis Foreman. . . ." (D.E. 165, S–13; D.E. 166, Ex. K.)

## III. THE PETITION TO STRIKE OR SET-OFF THE FOREMANS' FOURTH MORTGAGE.

By the precise terms of the Compromise Agreement (D.E. 166, Ex. I) and the Assignment (D.E. 166, Ex. K), the McCloskey claim and fourth mortgage were directly assigned by McCloskey to the Foremans. Thus, the implementation of these agreements gave the Foremans what was on its face a valid claim and fourth mortgage on the Debtor's leasehold interest. Kalodner seeks to ob-

literate this claim and fourth mortgage (hereinafter referred to as "claim"), by challenging, reinterpreting and restructuring the factual pattern set forth on the face of these agreements.

Kalodner's hypothesis may be broken down into three parts: (1) he first argues that the Foremans acquired the claim not from McCloskey, but somehow from Wolman; (2) he next contends that since the Foremans obtained the claim from Wolman, the claim is subject to set-off of the Spectrum's claim against Wolman; (3) he finally asserts that even if a set-off is not technically available, principles of equity dictate the need for a set-off. As to Kalodner's trilogy, I find that: (1) the Foremans did not acquire the McCloskey claim from Wolman, but rather acquired it from McCloskey; (2) with the aforementioned finding, Kalodner's second point is inapplicable as to the purported set-off of the Debtor's claim against Wolman; and (3) principles of equity provide no foundation for establishing a set-off which would not otherwise be legally sanctionable.

### A. THE CHAIN OF ASSIGNMENT.

Kalodner has made a valiant effort to prove, by an intricate re-interpretation and significant revision of the actual facts, that the Foremans acquired the McCloskey claim from Wolman instead of from McCloskey. While great creativeness is demonstrated by Kalodner in his restructuring of the transactions surrounding the McCloskey claim, I find that the restructured transactions are not the actual transactions.

Kalodner begins with the contention that the purported guarantee by the Eagles of the McCloskey claim was an ultra vires corporate act, and states that:

"The McCloskey guarantee was, as a matter of objective fact, as Foreman's protestations repeatedly pointed out, . . . the responsibility of Wolman."

(Kalodner's Brief in Support of Petition to Strike and Disallow Claim of Earl and Phyllis Foreman, p. 16.)

With the guarantee to McCloskey viewed as solely a Wolman obligation, Kalodner next interprets the Compromise Agreement (D.E. 166, Ex. I) as conditionally obligating the Foremans to provide Wolman with additional funds. Thus, Kalodner interprets the payment to McCloskey as flowing directly from Wolman, following either a loan from the Foremans to Wolman, or a payment by the Foremans directly to McCloskey on Wolman's behalf.[5] Kalodner argues that this interpretation is supported by the Compromise Agreement which provided that on the sale of the Eagles the McCloskey guarantee was to be paid in full first out of the Wolman distributive share and then out of the Foreman distributive share to the extent necessary. Kalodner stresses the fact that the Compromise Agreement provided for the assignment of the McCloskey claim to the Foremans, even if McCloskey was paid solely out of the Wolman distributive share.

With the *payment* to McCloskey recategorized as flowing directly from Wolman, it is next contended that Wolman had a right to the assignment of the McCloskey claim, which right Wolman assigned to the Foremans in the Compromise Agreement in return for the Foremans' conditional obligation to provide funds for the payment of McCloskey. Kalodner summarized his view of the payment of the McCloskey guarantee and the assignment of the McCloskey claim to the Foremans as follows:

"1. Foreman, pursuant to his agreement to do so, lends (or in part repays a loan to) Wolman sufficient funds for Wolman to discharge his obligation to McCloskey.

"2. Wolman pays McCloskey and has the right to the assignment of the McCloskey claim.

"3. Wolman, pursuant to a prior agreement, assigns to Foreman his right to have the agreement assigned to him. McCloskey thereupon assigns the claim to Foreman directly, thus short-cutting the actual assignment which is: *McCloskey* assignment *Wolman* assignment *Foreman*."

(Kalodner's Brief in Support of Petition to Strike and Disallow Claim of Earl and Phyllis Foreman, p. 19.)

The 5 page Guarantee Agreement of June 1, 1967 between the Eagles and McCloskey stated that the Eagles guaranteed the McCloskey claim (D.E. 166, Ex. B). It concluded that: "IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized officers and their corporate seals to be heretofore affixed as of the day and year first above written." It was then signed by Jerry Wolman as president and Joseph King as assistant secretary of the Eagles.

The Guarantee Agreement stated that it was the Eagles who guaranteed the McCloskey claim. (D.E. 165, S–6.) It is true that Foreman challenged this guarantee as an invalid corporate act and that the Board of Directors of the Eagles agreed to resist the McCloskey suit because the guarantee was thought to be ultra vires. However, no determination was ever reached as to the validity of the guarantee, for pursuant to the Compromise Agreement, Foreman relinquished his challenge of the guarantee and the McCloskey claim was paid. In view of the extensive transactions between Wolman and McCloskey in the past, I am not prepared to hold that the McCloskey guarantee claim was unenforceable against the Eagles.

Also, the record clearly reads that pursuant to the Compromise Agreement, McCloskey was paid the principal sum of $1,235,740.48, plus interest, out of the Foremans' distributive share and the Foremans were assigned the McCloskey claim. While approximately $3,000,000 was distributed to the Foremans or paid to their creditors, the Foreman distribu-

---

5. However, Kalodner views $280,000 of any payment Foreman made to Wolman or on Wolman's behalf as a repayment of the initial $280,000 loan Wolman made to Foreman when they purchased the Eagles.

tive share would have been approximately $5,350,000 if the Wolman share had been sufficient to pay the items charged to Wolman in the Compromise Agreement. (D.E. 165, S–10 and 13.)

I find Mr. Oswald's logic unassailable as he analyzes the Kalodner reinterpretation:

" . . . These interpretations, by the time Mr. Kalodner is through with them, produce some remarkable results. For although there is no shadow of a question that the McCloskey claim was satisfied with money that otherwise would have been the Foremans', we find Mr. Kalodner stating at page 19 of his brief that *Wolman* paid McCloskey and thereby acquired the right to assignment of the McCloskey claim. But the only basis for this suggestion is the construction of a purely fictitious 'loan' from the Foremans to Wolman, which in turn is supposed to have provided funds for *Wolman* to pay McCloskey.

"Of course, no such thing occurred. At the closing McCloskey was paid directly out of funds belonging to the Foremans, and the McCloskey claim was assigned directly to them." (Brief of Earl and Phyllis Foreman Contra Petition to Strike, pp. 5–6.)

 It is clear from the record that at the time the Compromise Agreement was entered into, the McCloskey suit on the Eagles guarantee was pending, and it was undetermined if said guarantee was valid or ultra vires. In addition to the uncertainty posed by the McCloskey suit, Wolman stood to benefit from a sale of the Eagles (N.T., August 19, 1971, p. 101) and Foreman was anxious to see the Eagles sold before his equity was lost. (D.E. 165, S–12.) Whatever the reasons of the parties entering into the Compromise Agreement, they agreed that on the sale of the Eagles the McCloskey guarantee was to be paid in full, first out of the Wolman distributive share if there were sufficient funds, and if not, then out of the Foreman distributive share to the extent necessary. They also agreed that the Foremans were to

be assigned the McCloskey claim. The Foremans in foregoing their objection to the Eagles purported guarantee to McCloskey and in agreeing to the probable payment of said guarantee from their distributive share, gave consideration for a flat commitment for the assignment of the McCloskey claim to them. Forbearance to assert a legal right is valuable consideration. York Metal and Alloys Company v. Cyclops Steel Company, 280 Pa. 585, 124 A. 752 (1924); Kravitz v. Mundry, 200 Pa.Super. 240, 189 A.2d 311 (1963). This is true even if the legal right is doubtful. Kefover v. Potter Title and Trust Company, 320 Pa. 51, 181 A. 771 (1935). On the basis of this record, I find that the McCloskey claim and fourth mortgage were assigned directly from McCloskey to the Foremans.

**B. FOREMAN'S KNOWLEDGE OF THE SPECTRUM'S CLAIM AGAINST WOLMAN.**

Kalodner's two step syllogism requires two interrelated findings in his favor: First, it requires the Court to find that the Foremans acquired the McCloskey fourth mortgage and claim *not* from McCloskey directly but instead from Wolman. This first requested finding has been just rejected Supra., pp. 761–763. Accordingly, as a matter of logic it is not necessary for me to make any findings as to Kalodner's second hypothesis —that Foreman had knowledge of the Debtor's claim against Wolman. For since I have found that the assignment went from McCloskey to Foreman, Foreman's knowledge of the Spectrum's claim against Wolman is irrelevant. However, without in any way qualifying my previous findings at pp. 761 to 763, I nevertheless make alternative findings on the issue of Foreman's knowledge as to the Spectrum's claim against Wolman.

When he signed the Compromise Agreement of October 31, 1968, I find that Foreman had knowledge that the Spectrum had a substantial claim against Wolman. Further, if Kalodner had proven that the assignment of the Mc

Closkey mortgage came from Wolman, then with the finding made in this section, the Foreman fourth mortgage and claim would be subject to a set-off of the Spectrum's claim against Wolman.

Such a set-off is permitted by the Spectrum by Section 68(a) of the Bankruptcy Act (11 U.S.C.A. Section 108) which provides:

> "In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid."

Set-off is specifically made available in a Chapter X reorganization by Section 200 of the Bankruptcy Act (11 U.S.C.A., Section 600). However, Section 68(a) does not enlarge the general principles of set-off as set forth in the Restatement of Contracts, Section 167, as follows:

> "§ 167. DEFENSES AND SET-OFFS TO WHICH AN ASSIGNEE'S RIGHT IS SUBJECT.
>
> \* \* \* \* \* \*
>
> "(3) A sub-assignee's right against the obligor is not subject to the set-off or counterclaim of a right of the obligor against a prior assignee unless the obligor's right was acquired prior to any sub-assignment by the prior assignee, *nor even in that case if a sub-assignee claiming under such prior assignee is a bona fide purchaser for value of the assigned right, without notice of the existence of the obligor's right.*"

Despite vigorous assertions of Earl Foreman to the contrary, I find that he had notice that the Debtor had a substantial claim against Wolman before the October 31, 1968 signing of the Compromise Agreement providing for the assignment, and clearly prior to the May 1, 1969 sale of the Eagles.

In Kalodner's direct examination of Earl Foreman, the following facts became clear: Earl Foreman acted as Wolman's general counsel " . . . in respect to those legal matters which he presented to me for representation . . . " until December of 1966 (N.T. August 19, 1971, p. 23), during which time the Spectrum had substantial claims against Wolman; the Debtor was managed for Wolman by Edward Snider, Earl Foreman's brother-in-law and exceedingly close friend (N.T. August 19, 1971, p. 24); during 1967, Foreman represented Snider in transactions which included the exchange of Snider's stock in the Spectrum for Wolman's stock in the hockey club, (N.T. August 19, 1971, p. 25); in the spring of 1967, Foreman pledged his stock in the Eagles in furtherance of a loan made to Wolman in connection with the Spectrum amongst other things (N.T. August 19, 1971, p. 29); commencing in January, 1967 Foreman participated in meetings concerned with Wolman's troubled financial affairs, and at such meetings various Wolman obligations were reviewed (N.T. August 19, 1971, pp. 37–38); in October, 1967, Foreman wrote a letter protesting to the use of Eagle funds for personal obligations of Wolman including advances to the Spectrum (N.T. August 19, 1971, pp. 38–39); at the time of the negotiation of the Compromise Agreement, Foreman was concerned with whether the McCloskey claim had any value (Transcript of August 19, 1971, p. 47). Viewing these facts and Earl Foreman's testimony of August 19, 1971 as a whole, I consider it incredible to believe that Earl Foreman did not have notice prior to October 31, 1968 of the Spectrum's substantial claim against Wolman.

## C. EQUITABLE CONSIDERATION

Kalodner also asks that the Foreman claim be stricken, even if on technical grounds set-off is not available, because the application of equitable principles dictates the need for set-off and striking of the Foreman claim.[6] Kalodner

---

6. In support of this proposition Kalodner cites Pepper v. Litton, 308 U.S. 295, 304, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939), 9 Am.Jur.2d Bankruptcy Section 431.

notes that under the Compromise Agreement, the Foremans minimized their exposure in that they were only obligated to pay McCloskey out of their distributive share if the Wolman share proved insufficient. Kalodner also stresses that in 1964 Foreman only invested $200,000 for 20% of the stock of the Eagles, borrowing $280,000 from Wolman for an additional 28% of the stock. Kalodner considers it inequitable for the Foremans, having received forgiveness of the $280,000 loan and approximately $3,000,-000 from the sale of the Eagles, to now receive $1,481,161.76 from the Spectrum. Kalodner seeks to phrase the issue in terms such that either the Spectrum or the Foremans will be "stuck" with a claim against Wolman. Finally, it is clear that the Kalodner plan for reorganization will fail if the Foreman claim is not stricken, and Kalodner contends that it is equitable to strike the Foreman claim so as to implement his plan which purportedly will provide Philadelphia with an additional $7,500,000 over a period of years. (Kalodner's Brief in Support of Petition to Strike and Disallow Claim of Earl and Phyllis Foreman, pp. 23–29).

There is an irony in Kalodner's self-serving argument allegedly based on the altar of equity. On one hand he condemns the Foremans because they received a large return from their $200,-000 investment in the Eagles and because they limited their obligation to pay McCloskey out of their share solely to the extent that Wolman's share proved insufficient. Yet, if the Foremans' claim were denied, Kalodner, who condemns as inequitable the enrichment of the Foremans, would benefit as the holder of 92% of the Debtor's stock even though he has not invested the first penny for this stock.

While Kalodner's investment in the Spectrum has been minimal the Foremans paid McCloskey the principal sum of $1,235,740 plus interest out of their distributive share from the sale of the Eagles. Also, while Kalodner contends that it is equitable to consider potential financial benefits his plan will confer upon Philadelphia, he and the City Fathers were originally content with the fairness of the Spectrum's original lease which was drafted by Kalodner himself. (N.T. July 23, 1971, p. 134).

## IV. IS THE FOREMAN-SNIDER PLAN "WORTHY OF CONSIDERATION"?

■ Having denied Kalodner's petition to strike and disallow the Foremans' claim, I find that the sole plan before me—the Foreman-Snider Plan—is worthy of consideration for submission to the Securities and Exchange Commission pursuant to Section 172 of Chapter 10 (11 U.S.C. 572).

A brief summary of significant aspects of the Foreman-Snider Plan (D.E. 145) is in order. All presently outstanding stock of the Debtor is to be extinguished based upon a finding of insolvency. The claims of the Fidelity Bank as first and second mortgagee shall be paid in full. The claim of ARA, third mortgagee, shall be paid pursuant to the terms of the agreement of October 31, 1968, as amended (F–S 2) between the Foremans and ARA. The fourth mortgage, held by the Foremans, shall be either satisfied by the issuance of shares of stock in the new company to the Foremans, or shall be wholly subordinated to all new debt incurred in financing the Foreman-Snider Plan and the needs of the new company. Payment in full will be made for administration expenses, taxes [7] and mechanics lien claims

---

7. When the Foreman-Snider Plan was originally filed, it was conditioned upon a resolution of both the real estate tax assessment and a use and occupancy tax. The real estate tax matter has been disposed of by reason of my prior Opinion. Since

to the extent the Court shall determine that they are valid. Unsecured creditors other than Leonard Tose will be paid 50% upon consummation and the balance in four annual equal installments. The Tose claim, reduced to $250,000 by an agreement approved by the Court (Docket Entry No. 177), will be satisfied by payment of $50,000 at consummation and the balance in five annual equal installments beginning at the end of the fifth year following consummation. The plan is subject to the condition that the City of Philadelphia waive all defaults under the lease agreement, confirm that the lease agreement is in good standing, and consent to such mortgages as shall be made in connection with financing the plan.

To implement the Foreman-Snider Plan, initial payments of $8,115,000 must be made. With the total of Spectrum's cash and accounts receivable net of accounts payable as of December 31, 1971, equal to approximately $1,785,000, the Foreman-Snider Plan requires the refinancing of $6,330,000. (Kalodner's Brief in Support of Debtor's Plan of Reorganization, Appendix A). First Pennsylvania Bank has agreed to give Foreman and Snider a $6,500,000 first mortgage and a $500,000 line of credit (F–S 1, 4).

The Foreman-Snider Plan makes no provision for stockholders in eliminating their interest. Section 216(8) of the Bankruptcy Act, 11 U.S.C.A. § 616(8) provides that a plan need not make provision for stockholders " . . . if the judge shall determine that the debtor is insolvent." I find that the Spectrum is insolvent.

Jackson-Cross & Co., as a disinterested independent appraiser, valued the Spectrum's leasehold interest at a mere $7,350,000 far short of the total debts of the Debtor.[8] Kalodner attacks this valuation because it assumes estimated net operating income of $1,000,000 a year and 75% financing at an interest rate of 10½% contending that the realities of the Foreman-Snider Plan and increasing income expectations justify a higher valuation. However, the Jackson-Cross appraisal was based on a capitalization of the estimated future earnings of the Spectrum after a thorough consideration of its history, current earnings, physical condition, future profits and inquiry into comparative situations in the arenas in St. Louis and Madison Square Garden.[9] These are the proper tests for a valuation under Chapter X. In re Quaker City Cold Storage Co. (E.D.Pa.1947), 71 F.Supp. 124. Furthermore, the appraisal was concerned with the value to an average investor—not with the value to investors who have valuable interests in sporting teams which are actual or potential lessees of the Spectrum. In fact, the actual insolvency of the Spectrum is confirmed by the fact that despite the vigorous efforts of the Trustees to stimulate interest in the Spec-

---

the parties have not briefed the issue of the use and occupancy tax, I assume that this matter has been either resolved with the City of Philadelphia or that at least the proponents of the Foreman-Snider Plan no longer make resolution of the use and occupancy tax a condition of their reorganization plan.

8. Apparently both Kalodner and counsel for Foreman and Snider used a figure of $9,901,000 as the debt of the Spectrum after having given full credit for the Trustees' cash and net receivables. See Foreman-Snider Brief re Plan of Reorganization, p. 4, and Kalodner Brief in support

of Debtor's Plan of Reorganization, p. 5. For my purposes I use the figure of $9,900,000 as the Spectrum's net debt.

9. As noted in their appraisal, Trustee's Exhibit 3, their estimate of the market value of the leasehold interest of the Spectrum was defined as follows:

"The price which a well-informed buyer acting intelligently, voluntarily, and without necessity would be warranted in paying, and a well-informed seller acting intelligently, voluntarily and without necessity would be warranted in accepting for the property as of a certain date."

trum, no one has come forth with a plan which will provide for any payment to the stockholders. In fact, the one plan before me attests to insolvency of the Spectrum because it is only able to provide for the 100% payment of the unsecured creditors over a period of years through the agreement of the Foremans that their fourth mortgage be capitalized or subordinated. A final indication of the Spectrum's insolvency is the fact that when Wolman recently (April 22, 1971) transferred his shares of stock in the Spectrum to Kalodner, Wolman received no actual payment— only a right to future payment if Kalodner ever realized anything on the stock. (See p. 757, *supra*.)

## ORDER

And now, this 31st day of August, 1971, having found that the Plan for Reorganization of Spectrum Arena, Inc., filed by the Trustees as amended and modified is the only plan worthy of consideration, it is hereby ordered that the said plan filed by the Trustees as amended and modified be, and hereby is submitted to the Securities and Exchange Commission for examination and report. The Securities and Exchange Commission is herewith directed to file, within ten days of the date hereof, an advisory report on said plan or a statement that it will not file a report. Further, the said Trustees be, and they hereby are, directed to forthwith transmit two (2) copies of said plan, as amended, together with two (2) copies of this Order, to the Securities and Exchange Commission, addressed to its regional office at 26 Federal Plaza, New York, New York, 10007; and further, the parties are directed to within five (5) days file a proposed time schedule consistent with this Opinion, for the tentative implementation of the Trustees' Plan including any date for additional hearing, submission to the creditors and stockholders, final Court approval and payment of debts and administrative costs.