**In the Matter of SPECTRUM ARENA, INC., Debtor.**

**No. 30437.**

United States District Court, E. D. Pennsylvania.

Dec. 23, 1971.

Thomas R. White, Jr., LeRoy E. Perper, Philadelphia, Pa., for ARA Services.

I. Grant Irey, Jr., Philadelphia, Pa., for Fidelity Bank.

Gilbert W. Oswald, Philadelphia, Pa., for Foreman-Snider.

Philip P. Kalodner, Philadelphia, Pa., for Debtor.

IN PROCEEDINGS FOR REORGANI-
ZATION OF A CORPORATION
UNDER CHAPTER X THE BANK-
RUPTCY ACT

## OPINION

Re: Petition for an Accounting of ARA Services, Inc.

HIGGINBOTHAM, District Judge.

### I.

On May 1, 1968, the Spectrum Arena, Inc. (hereinafter referred to as the "Spectrum" or "Debtor") was involuntarily placed into reorganization under Chapter X of the Bankruptcy Act of 1898 (11 U.S.C. § 501 et seq.). As has been more fully documented in my prior Opinions of August 9, 1971, 330 F. Supp. 125, August 31, 1971, 340 F.Supp. 755, and October 28, 1971, 340 F.Supp. 767, the Spectrum serves as a complete multi-service sports and general entertainment facility. Jerry Wolman, the founder and builder of the Spectrum, at an early stage entered into discussions and finally an agreement with Automatic Retailers of America, Inc. (ARA) to provide food and other concession services for the spectators attending the Arena's many events.[1] In addition to the normal bill of fare of such arenas the parties to the original discussion, Wolman and ARA, agreed to the creation of a private membership club within the Spectrum to serve those fans whose tastes would only be satisfied by the extraordinary. The parties have stipulated the history as the following:

"In the summer of 1966, while the Spectrum was still in the planning

Sidney Chait, Philadelphia, Pa., for Trustees.

1. For an extensive explanation of negotiations and agreements as to the ARA loan to the Spectrum, see, Opinion of October 28, 1971, 340 F.Supp. pp. 772–776.

process, the partnership which controlled it, consisting of Jerry Wolman and Edward Snider as principal partners together with other minor partners including petitioner, [Kalodner], authorized Snider to initiate negotiations with ARA with reference to the obtaining of a loan and the granting of a Concession Agreement to ARA. Mr. Snider did meet with Mr. Fishman and reached a basic agreement after one or two meetings. The principal items agreed upon were the amount of a loan and manner of repayment, the percentage to be paid the Spectrum from the regular concessions, the obligation of ARA to operate a private club on the premises at its own risk and to pay the initial cost of equipping and furnishing it, and an agreement to split the profits of the Club, if any . . . .

"On or about May 1, 1967, the Spectrum Arena, Inc., assumed Wolman's obligations under the Concession Agreement and from that date on, ARA treated the Spectrum Arena, Inc. as being in Wolman's position for purposes of accounting and payment under the Concession Agreement." [2] (Docket No. 270.)

The original agreement between the parties is set forth in a Letter Agreement of July 26, 1966, (Exhibit A to Stipulation, Docket No. 270) between ARA and Wolman and signed by both. In the original Letter Agreement of July 26, 1966 the parties provided in the last paragraph on page 5 that ARA would prepare "a more detailed agreement along these lines which, when executed, will supercede this agreement." In fact, on July 27, 1966,[3] ARA and Wolman signed the Concession Agreement in issue here. (Exhibit "A" to Docket No. 217.)

## II.

## PETITION FOR AN ACCOUNTING: PROCEDURAL HISTORY.

At issue in this ancillary matter involving the Spectrum is whether ARA has properly accounted for funds due the Spectrum under the above-mentioned Concession Agreement, and before reaching the merits, a short procedural history of this proceeding is appropriate.

On September 16, 1971, Philip P. Kalodner [4] filed a Petition to Require an Accounting of ARA Services, Inc., with respect to all receipts and expenditures in its management of the Blue Line Club, the above-described private membership club physically located within the Spectrum but under the contract management of ARA. This petition alleged two counts, both of which I held under advisement. On October 28, 1971, I filed a major Opinion disposing of some of the issues involved in the Spectrum matter, including, *inter alia*, a finding that the Debtor was insolvent (Opinion of October 28, 1971, 340 F. Supp. pp. 778–779)[5]. Further, I stated that the issue raised in the instant petition did not bear on the issues disposed of in that Opinion. (Opinion of October 28, 1971, p. 782). My rationale was that the magnitude of the funds which could be due the Spectrum (even if all the relief asked by Mr. Kalodner in his petition were granted) would not be sufficient to retrieve the Spectrum from a state of patent insolvency to even an arguably solvent position.

On October 6, 1971, ARA filed a motion to dismiss the petition for an accounting of ARA and in the alternative an answer. (Docket No. 238). On November 10, 1971, the Trustees in these

---

2. See, Opinion of October 28, 1971, 340 F. Supp. p. 744.

3. The parties state in the Stipulation (Docket No. 270, p. 2) that the Concession Agreement was not actually signed "until sometime in 1967". So long as the Concession Agreement was signed *after* the Letter Agreement the actual date of signing is irrelevant.

4. For Mr. Kalodner's total role in these proceedings, see, Opinion of August 31, 1971, Footnote 3, p. 756 of 340 F.Supp.

5. See also, Opinion of August 31, 1971, 340 F.Supp. pp. 765–767.

proceedings also filed a petition for an order directing ARA to account for and properly credit certain items charged as expense in the operation of the Blue Line Club (Docket No. 244). On November 19, 1971, ARA filed an answer to the Trustees' petition in which ARA denied that certain deductions for "interest in rent," "management fees in excess of 5% of gross receipts" and "interest expense" were unwarranted, but agreed "to restate its account to the Debtor corporation to reflect appropriate credit for the deductions made by ARA Services, Inc., described in paragraph 4 of the [Trustees'] petition." (Answer of ARA, Docket No. 249.)[6]

Accordingly, the only item alleged by Mr. Kalodner to have been improperly charged by ARA as an expense in the operation of the Blue Line Club and which ARA has not agreed to "restate" is the matter of "rent expense" in the amount of $176,546.45 as of October 3, 1971, as shown in Exhibit "G" to the Stipulation filed in this proceeding. (Docket No. 270).

## III.

## IS THE "RENT EXPENSE" DEDUCTIBLE?

The narrow question remaining for my decision is whether the Concession Agreement of July 27, 1966 permits ARA to deduct as a cost of operating the Blue Line Club "rent expense" in the amount of $47,083.32 per year which is the cost incurred in the construction of the Blue Line Club as amortized over the original ten year term of the Concession Agreement. I find, for the reasons appearing hereinafter, that ARA is entitled to deduct the rent expense, as an annual amortization of the original equipment, furnishings, and installation costs.

### A. Jurisdiction

At the outset, it should be noted that ARA filed a motion to dismiss (Docket No. 238) the petition for an accounting.[7] (Docket No. 217). In its motion to dismiss and brief in support of the motion, ARA takes the position that as the Trustees have not joined the petitioner as to this item, Mr. Kalodner

---

6. ARA conceded these items without prejudice to its position in the instant proceeding.

The structure which ARA originally adopted to run the Blue Line Club included the following:

(1) A lease by ARA to Blue Line Club, Inc., a nonprofit corporation, for an annual rental of $62,304 of which $47,083.32 constituted actual rent expense and $15,220.68 constituted interest on ARA's investment in the Blue Line Club (Exhibits "D" and "G") ; and

(2) A management agreement between ARA and ARASERV at a weekly fee of $500 (Exhibit "E" to Docket No. 270). The accounting which ARA supplied in connection with this proceeding (Exhibit "G" to Docket No. 270) shows the accumulated deficit in the operation of the Blue Line Club as $246,960.27. In accordance with ARA's statement that it would restate its account (Docket No. 270) to reflect the changes asked for by the Trustees (Docket No. 244) the following amounts have been added back to reduce the deficit: (1) management fees in excess of 5% of Club Gross Receipts in the amount of $31,718.02; (2) interest expense of $36,195.75; and (3) interest in rent expense of $57,077.55. If these amounts are added back to the total deficit, the account would properly reflect a total accumulated deficit of $121,968.89.

7. While Mr. Kalodner has labelled his petition as one for an accounting, he is actually asking this Court to determine his contentions under § 115 of the Bankruptcy Act (11 U.S.C. § 515) and § 197 of the Bankruptcy Act (11 U.S.C. § 597). The Court under Chapter X of the Bankruptcy Act has broad, equitable powers which include the right and duty to make findings on the solvency of the debtor corporation under §§ 216(8) and 221, and the right to classify the claims of creditors, pursuant to § 197 of the Bankruptcy Act (11 U.S.C. § 597). In furtherance of the above duties, I find that the instant petition is properly before me as a matter of federal law. See generally, 6 Colliers on Bankruptcy, 3.16, at pp. 532–45, and 6A Colliers on Bankruptcy, 9.10, at pp. 211–24.

has no standing to press his petition for an accounting because as a stockholder in an insolvent corporation, the worthless shares give him no financial interest in the outcome (of the accounting).

I am obligated to consider any data which could provide a sufficient economic basis to change Debtor's position from insolvency to solvency. Of course under the statute when filing my final opinion for the confirmation or rejection of the Trustees'—Foreman-Snider Plan of Reorganization, I will and must make an additional finding as to whether the Spectrum is or is not solvent. Obviously at some point, any insolvent corporation with a sufficient transfusion of additional income could become solvent. The potential availability of the additional income involved in this petition of accounting may be relevant to the solvency issue, and thus I consider the petition of accounting as filed by Mr. Kalodner, a shareholder and creditor, even though the able Trustees do not join him on the issue of whether ARA is entitled to deduct as an expense the amortization of equipment, furnishings, and installation costs.

 Further, in Mr. Kalodner's multi-faceted role, he also appears as a creditor who under the Trustees' plan of reorganization will be paid 50% of his claim over the four year period following consummation. Thus, to the extent that ARA may owe additional funds to the Spectrum in the future, a creditor may properly raise the claim for an accounting. Finally, this Court having determined that the petition for an accounting is properly raised as an ancillary matter to a Chapter X reorganization, it must permit any creditor or shareholder the right to intervene. For all the above reasons, I hereby DENY the motion to dismiss the petition for an accounting of ARA.

B. *The Concession Agreement: Is It Ambiguous as to "Direct Costs?"*

Having decided that the issue is properly before me as to whether ARA may deduct the cost of equipment, furnishings and installation, I must carefully examine the July 27, 1966 Concession Agreement to determine if that agreement on its face resolves the dispute between Kalodner and ARA.

The disagreement between ARA and Kalodner focuses on what is the proper share of the profits resulting from the operation of the Blue Line Club which ARA is to pay to the Spectrum pursuant to the Concession Agreement. The crux of the dispute focuses on the term "direct costs" as used in ¶6.2 of the Concession Agreement which provides in part as follows:

" . . . Tenant [Spectrum] will fix and collect Blue Line Club membership fees, and after deducting therefrom Tenants' direct costs of collecting the membership fees, will turn over the balance thereof to Concessionaire [ARA] for inclusion in Club Gross Receipts. Concessionaire will deduct from Club Gross Receipts, *all direct costs of operating the Blue Line Club*, plus 5% of the Club Gross Receipts, including said balance of membership fees to cover Concessionaire's administrative costs, with any deficit to be carried forward to the succeeding year or years." (Emphasis added.)

Under ¶4.2 of the Concession Agreement, ARA is required to provide at its expense all of the equipment, furnishings and interior decorations necessary to the operation of the Blue Line Club. The parties have stipulated (Docket No. 270, ¶9) that ARA's total cost in the "construction, equipping and furnishing of the concession stands throughout the Arena, the commissory serving their concession stands, and the Blue Line Club was $741,053.04. Such costs directly relating to the Blue Line Club amounted to $459,062.00. . ."

If the position of Kalodner is sustained, ARA would be required to absorb the $459,062.00 costs incurred in equipping and furnishing the Club. On the other hand, if ARA is correct, it was and is entitled to deduct annually, as a "direct cost", the pro rata portion of the

aforementioned capital costs originally incurred over the initial ten year term of the Concession Agreement.

Under Pennsylvania law, if a contract is unambiguous on its face as to the meaning of its terms, it must be interpreted without the aid of extrinsic evidence.[8] I have carefully examined the instant contract and can discern no express definition of the term "direct costs of operating."

The petitioner urges that ¶4.8 of the Concession Agreement which permits ARA to remove such furnishings and equipment as remain the property of the Concessionaire, when read in conjunction with ¶7.2 which permits ARA to extend the term for an additional ten years are too vague to allow ARA to amortize the costs of equipment and furnishings. This indefiniteness, Kalodner continues, does not enable one to determine the appropriate, annual amortization. I find the above arguments of the petitioner not to be persuasive on two grounds: (1) ¶4.6 of the Concession Agreement in specifying a 10% amortization rate assumes a ten year depreciation schedule, and (2) the right of ARA to remove the furnishings is consistent with the obligation of the Spectrum to purchase them. (See, pp. 792–793, *infra*.)

ARA states in its brief that in order to determine what the terms "direct costs of operating" mean in the July 27, 1966 Concession Agreement, one must read the July 26, 1966 Letter Agreement (which preceded the Concession Agreement) together with the final July 27, 1966 Concession Agreement. The July 26, 1966 Letter Agreement provides in relevant part as follows:

" . . . [W]e will provide the necessary concession equipment and furnishings for the Club and bear the installation cost thereof. We will *amortize this as a direct cost on a straight line basis over the initial term of ARA's agreement with you."* (Emphasis added.) (Exhibit "A" to Docket No. 270, p. 3.)

ARA apparently agrees that without the aid of the Letter Agreement of July 26, 1966, one cannot conclusively determine what is meant by the terms "direct costs of operating". The cornerstone of ARA's position is that the Letter Agreement and the Concession Agreement are in fact one contract and must be read together. However, the parties expressly provided in the Letter Agreement that the execution of the final Concession Agreement would supercede the Letter Agreement. I find that the above-quoted language in the Letter Agreement cannot be used to define the terms "direct cost of operating" in the Concession Agreement unless there is first a finding that the Concession Agreement is itself ambiguous.[9] Thus, before turning to extrinsic evidence of the meaning of the terms in question, one must determine (1) whether the plain meaning of words supports the claims of either party, or (2) whether the terms are ambiguous.

In Gerhart v. Henry Disston & Sons, Inc., 290 F.2d 778, 784 (3rd Cir. 1961), the Court of Appeals when construing Pennsylvania Contract Law said:

"In determining whether or not there is an ambiguity the whole contract must be considered and not an isolated part. (Citations omitted.) A contract is ambiguous if, and only if, it is reasonably or fairly susceptible of different construction; it is not ambiguous if the court can determine the meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends."

ARA relies on a definition of "direct costs" as "costs that are directly assignable to the product or service being

---

8. Krauss v. M. L. Claster & Sons, Inc., 434 Pa. 403, 254 A.2d 1 (1969); Keyser v. Margolis, 422 Pa. 553, 223 A.2d 13 (1966).

9. Factor v. Getz, 442 Pa. 384, 276 A.2d 511, 513 (Pa.1971).

produced.[10]" ARA urges that standard definition provides conclusive support for its position. While the definition as provided by a standard textbook provides ARA with a most persuasive argument which some finders of fact might find to be conclusive enough for resolution of the issue in ARA's favor, I find that on a total view of the Concession Agreement, the interpretations of the parties, and of the definition quoted above, the Concession Agreement of July 27, 1966 is ambiguous as to whether the terms "direct cost of operating" include the annual amortization of ARA's cost of equipment and furnishings installed in the Blue Line Club.

### C. Extrinsic Evidence.

■■■ Having determined that the Concession Agreement is ambiguous the Court may look to extrinsic evidence, including the July 26, 1966 Letter Agreement, for aid in giving meaning to the disputed terms.[11] In addition, Pennsylvania law clearly provides that when a contract contains an ambiguity, the Court may use parol or extrinsic evidence to aid in interpreting what the parties intended by the use of terms.[12] However, under the Pennsylvania view only a latent (not patent) ambiguity may be resolved by parol or extrinsic evidence.[13] A latent ambiguity is defined as follows:

> "A latent ambiguity is one that becomes apparent when the instrument is sought to be enforced and it is then discovered that the intention of the parties cannot be ascertained without extrinsic evidence." [14]

I find that the use of the terms "direct cost of operating" constitutes a latent ambiguity in the July 27, 1966 Concession Agreement which therefore requires me to look to extrinsic evidence for their meaning.

I find that the best evidence as to what the parties intended by the terms "direct costs of operating" appearing in ¶6.2 of the Concession Agreement would be the previously quoted language in the July 26, 1966 Letter Agreement. That language provides:

> "[W]e will provide the necessary concession equipment and furnishings for the Club and bear the installation cost thereof. We will *amortize this as a direct cost on a straight line basis over the initial term* of ARA's agreement with you." (Emphasis added.) (Exhibit "A" to Docket No. 270, p. 3.)

The parties in the July 26, 1966 Letter Agreement further provided that "Our attorneys will prepare immediately a more detailed agreement along these lines. . ." (Exhibit "A" to Docket No. 270, p. 5). The only phrase in the subsequent agreement where the term "direct cost" appears is in the disputed language in ¶6.2 where it becomes "direct cost of operating."

■■■ It appears that the intent of the parties was to permit ARA to amortize (write down) the cost of Club equipment against the income which the Club produced. This interpretation is consistent with ¶4.6 of the July 27, 1966 Concession Agreement which forces the Tenant (Spectrum) to purchase the equipment and furnishings of the Club at ARA's option with the equipment purchase price to be reduced by ten

10. Prentice-Hall, Inc., Industrial Accountant's Encyclopedic Dictionary (1964), p. 213.

11. United Aircraft Corp. v. Boreen, 284 F. Supp. 428, 439–440 (E.D.Pa.1968), aff'd. 413 F.2d 694 (3rd Cir. 1969).

12. e. g., Factor v. Getz, 442 Pa. 384, 276 A.2d 511 (Pa.1971); A & J Solomon Wrecking Co. v. Raymond Colliery Co., 437 Pa. 342, 346, 263 A.2d 743, 745 (1970); In re Estate of Rosciolo, 434 Pa. 461, 258 A.2d 623 (1969); Consoli-

dated Tile & Slate Co. v. Fox, 410 Pa. 336, 189 A.2d 228 (1963); see generally, 15 P.L.E. §§ 331–337, at pp. 43–46.

13. Leebov v. United States Fidelity & Guaranty Co., 401 Pa. 477, 165 A.2d 82, 86 (1960).

14. Brown, M., Pennsylvania Evidence, George T. Bisel Co. (1949, Supp.1970); see also, 3 A. Corbin, Contracts § 543A and supplement, West Publishing Co. (1960).

percent [15] per year from the date of installation. Thus, at the end of any given year of the initial ten year term, the Spectrum would pay the remaining unamortized value remaining in the equipment and ARA would have had a corresponding deduction against Club Gross Receipts for the years which had passed. This construction is consistent too with the specific language of the Letter Agreement which the relevant part on page 3 provides that ARA would "bear the *installation cost thereof.*" The better view of these terms would force ARA to incur the initial capital outlay, with its costs being reimbursed as expenses against the revenues of the Blue Line Club operation. In conclusion, I find that by viewing the Letter Agreement and Concession Agreement together, it was the intent of the parties that ARA be permitted to deduct the annual amortization of capital costs of equipping and furnishing the Blue Line Club as a "direct cost of operating" the Club. After considering the Letter Agreement and the Concession Agreement, I reject the claim of Mr. Kalodner that ARA should be required to reimburse the sums deducted as "rent expense" on the accounting supplied as Exhibit "G" to Docket No. 270.[16]

A comment must be made on the assertion of Mr. Kalodner in his Supplemental Memorandum on the Merits, p. 6, (Docket No. 269) that because the language of the Concession Agreement and the Letter Agreement were both drafted by ARA, it must be construed against them as not permitting the deduction.[17] While the Pennsylvania law clearly holds that a contract where ambiguous must be construed against the drafter, that rule has largely been applied in the case of insurance contracts.[18] In cases involving general contracts, Corbin states the view that the rule of "construction against the drafter" should be applied only when "having admitted in evidence and duly weighed *all the relevant circumstances and communications between the parties*, there may still be a doubt as to the meaning that should be given and made effective by the Court."[19] (Emphasis added.)

Here upon a consideration of just the *written* evidence, I find that the ambiguity must be resolved in favor of ARA.

Although the ambiguity as to what the original parties meant by the use of the terms "direct cost of operating" has been resolved by reference to the written Letter Agreement and written Con-

15. A rate of 10% per year assumes that the useful life of the equipment is ten years.

16. Mr. Kalodner strongly argues that the appearance in ¶ 6.2 of the "Second Corrected Draft of the Concession Agreement" (Exhibit P–11 to the Depositions filed in this matter) of the terms in question as "will deduct all direct costs of labor employed and materials consumed in operation of the Club . . ." constitutes evidence that the parties intended that ARA would not deduct the cost of equipment as an expense against Club Gross Receipts. He further urges that the fact that Mr. Lee F. Driscoll, General Counsel to ARA, in striking out the words "labor employed and materials consumed in" in his corrections somehow intended to exclude depreciation. Finally, Mr. Kalodner asserts that the explanation in Mr. Driscoll's letter to Mr. Cushmore of White and Williams (Exhibit "P–12" to Depositions, Exhibit "C" to Docket No. 270) that "I am striking the words 'labor employed and materials consumed in' as not to exclude from direct costs such items their [ARA's] utilities, insurance, taxes, etc." is conclusive on the issue. I find that the failure of Mr. Driscoll to mention the amortization of the cost of furnishing and equipping the Blue Line Club is in this context at best inconclusive on the subject of who was to bear the cost. I find that the parties did intend to allow ARA to deduct the cost of equipment as a deduction against Club Gross Receipts.

17. The parties have agreed in the Stipulation (Docket No. 270, at pp. 2–3) that the language in question was drafted by counsel for ARA.

18. See, e. g., Hafer v. Schauer, 429 Pa. 289, 239 A.2d 785 (1968).

19. 3 Corbin, Contracts, § 559, at p. 262. Corbin also states that the rule should not be applied unless other rules of interpretation have been exhausted. (§ 559, at p. 268.)

794

cession Agreement, I nonetheless made a careful and complete review and evaluation of the extensive oral testimony offered by the parties in the form of several depositions and the summaries contained in the Stipulation entered by the parties. (Docket No. 270.) I find that after careful examination, the oral testimony corroborates my findings that the Concession Agreement gives ARA the right to deduct as an expense the cost of equipping and furnishing the Blue Line Club over the initial ten year term of the Concession Agreement.

Accordingly, I hereby DENY the petition for an accounting of ARA to the extent the issues raised in that petition have not been conceded by ARA's answer to Trustees' petition. (Docket No. 249).[20]

This Opinion filed pursuant to Rule 52(a) of the Federal Rules of Civil Procedure (28 U.S.C. Rule 52(a)) constitutes the prerequisite findings of fact and conclusions for the findings made herein. I also incorporate my prior findings of fact and conclusions of law in the Opinions of August 9, 1971, August 31, 1971, and October 28, 1971, to the extent that they are not modified by the present findings.

---

20. See Note 6, *supra,* and text accompanying.