In the Matter of **SPECTRUM ARENA, INC., Debtor.**
No. 30437.

United States District Court,
E. D. Pennsylvania.
Oct. 28, 1971.

Sidney Chait, Philadelphia, Pa., for Trustees.

LeRoy F. Perper, Philadelphia, Pa., for ARA Services.

I. Grant Irey, Jr., Philadelphia, Pa., for Fidelity Bank.

Gilbert W. Oswald, Philadelphia, Pa., for Foreman-Snider.

Philip P. Kalodner, Philadelphia, Pa., for Debtor, himself.

## OPINION

HIGGINBOTHAM, District Judge.

### I.

On May 1, 1968, the Spectrum Arena, Inc., (hereinafter referred to as the "Debtor" or the "Spectrum") was involuntarily placed in reorganization under the Bankruptcy Act of July 1, 1898, Chapter X (11 U.S.C. § 501 et seq.). After three years of superb management, the Trustees, Harvey N. Schmidt, Esquire, and William David Webb, Esquire, have so revitalized the business that there are now pending two reorganization plans which through reorganization allegedly would pay all secured and unsecured creditors one hundred percent of their claims; and thus, the Arena could potentially become a viable financial entity.[1]

In corporate reorganizations, trustees are often complimented when they are successful in working out plans which would pay only the secured creditors, it is indeed rare when *un*secured creditors are able to get any substantial payment for their claims. Under the Trustees' Proposed Plan which would pay one hundred percent to all creditors, secured and unsecured, there has been a miraculous turnaround in the potential of this presently insolvent business.

Two proposals for reorganization have been filed and fiercely litigated through extensive evidentiary hearings, argument and briefs.

One, as amended, is endorsed and preferred by the Trustees and was proposed originally by Earl M. Foreman and Edward N. Snider (this Plan will hereinafter be referred to as the "Foreman-Snider Plan" or the "Trustees' Plan"). The second plan has been filed by Philip P. Kalodner, Esquire, as stockholder, creditor and counsel for the debtor corporation (hereinafter referred to as the "Kalodner Plan" or the "Debtor Plan").[2]

Three months after the Foreman-Snider Plan was filed, Mr. Kalodner filed his first Plan on June 28, 1971, providing for $7,500,000 financing to be raised

---

1. There have been two major Opinions pertaining to this reorganization, the Opinion of August 9, 1971, 330 F.Supp. 125, pertaining to the real estate tax liability, and the Opinion of August 31, 1971, 340 F.Supp. 755, holding that the Trustees' Plan (as proposed by Foreman and Snider) was "worthy of consideration" for submission to the Securities and Exchange Commission. This latter Opinion will be referred to hereinafter as "Opinion of August 31, 1971."

2. For Mr. Kalodner's background and total role as a proponent of this Plan, see Opinion of August 31, 1971, footnote 3, at p. 756.

through bonds which would be sold by a non-profit corporation. (See Docket No. 153.) On July 23, 1971, in the midst of an evidentiary hearing, he moved to amend his plan to obtain financing in the amount of $8,000,000. Mr. Kalodner's Plan is predicated on an anticipated sale of bonds through Bache and Company for the entire financing of the proposed transaction. He has not made any cash outlay for the ninety-two percent of the debtor's stock which he now purportedly owns.[3] The Kalodner Plan which I today hold not "worthy of consideration" for submission to the Securities and Exchange Commission, (see pp. 772–778, infra) is his third amended plan. The current Kalodner Plan was filed after this Court held the Foreman fourth mortgage valid. (See Opinion of August 31, 1971, 340 F.Supp. pp. 758–759).

The ultimate issues for this Court's present adjudication are two:

(1) Whether the third amended plan by Mr. Kalodner is "worthy of consideration" for submission to the Securities and Exchange Commission (hereinafter referred to as "SEC") for their review pursuant to § 172 of Chapter X, 11 U.S. C. § 572. See generally, 6 Colliers on Bankruptcy, ¶ 7.30, pp. 1257–64, and discussion of the Trustees' Plan, pp. 765–767, Opinion of August 31, 1971.

(2) Since, in my August 31, 1971 Opinion, I found that the Trustees' Plan was "worthy of consideration" for submission to the Securities and Exchange Commission, the second issue is whether the Trustees' Plan is also "fair, equitable and feasible" pursuant to § 174 of the Bankruptcy Act, 11 U.S.C. § 574, and therefore proper for submission to Creditors.

■ On August 20, 1971, I entered an Order denying Mr. Kalodner's petition to strike the Foreman fourth mort-

gage claim in the amount of $1,481,969.-76 as of April 30, 1971.[4] As a result of my findings that the Foreman fourth mortgage claim was valid, the Kalodner Plan for reorganization was inadequate and not "worthy of consideration" for submission to the Securities and Exchange Commission because it failed to provide for the payment of the $1,481,-969.76 mortgage of Foreman, a preferred creditor. Necessarily by the failure to provide for the payment of $1,-481,969.76 to a secured creditor, the unsecured creditors would not under the former Kalodner (Second) Plan have any funds available for the payment of any portion of their debt because the "absolute priority rule" requires total payment to creditors in descending order of lien. (See pp. 779–780, infra.).[5]

On August 20, 1971, when the major proponents of the reorganization plans in issue were before me, I thought that after the arduous three years travail we had drawn the final curtain necessary for my preliminary adjudication for the possible submission of a plan or plans to the creditors and the Securities and Exchange Commission. Counsel were expressly asked whether the record was closed.

At the conclusion of the testimony on August 19, 1971, the following colloquy occurred since I was particularly anxious to make certain that the record would be closed *finally* to make the prerequisite adjudications for the plans then in issue:

"MR. KALODNER: Based upon that stipulation, I would drop my request for any further testimony on this matter, Sir, eliminate it.

"THE COURT: Do you agree to the stipulation, Mr. Oswald?

"MR. OSWALD: That is satisfactory, Your Honor.

---

3. See Opinion of August 31, 1971, pp. 757, 765, 767; see also, p. 779, infra.

4. The Trustees' Report of July 31, 1971, "Schedule I–Notes Payable" shows the principal as $1,234,225.81. In prior evidentiary hearings, it was not challenged that as of April 30, 1971, the total amount

owed with accrued interest was $1,481,-969.87 and for the purposes of this Opinion, I will use this latter figure.

5. 6A Colliers on Bankruptcy, ¶ 11.06, at 607–637 (11th Ed. 1969) (hereinafter cited as Colliers).

"THE COURT: Mr. Chait?

"MR. CHAIT: No objection. It is satisfactory.

"THE COURT: *So, the record is completely closed now*, gentlemen. No further evidence to be presented for my further enlightenment at any time prior to adjudication.

"MR. KALODNER: Yes, sir.

"MR. OSWALD: Yes, sir.

"THE COURT: Very well."

(N.T., August 19, 1971, pp. 91–92.)

In my Opinion of August 31, 1971, holding that the Trustees' Plan was "worthy of consideration" for submission to the Securities and Exchange Commission, I emphasized that "all parties have been granted great liberality in amending their proposals, since my primary concern has been the desire to see all creditors including unsecured creditors paid one hundred percent of their fully valid claims. *However, even litigation in corporate reorganization should not be an endless tunnel for the continuous depositing of amended plans.*" (Opinion of August 31, 1971, p. 758.)

After my Opinion of August 31, 1971, Mr. Kalodner filed another material amendment to his Plan wherein he alleged that the bonding issue required for financing his Plan would be increased from $8,000,000 to $9,500,000.[6]

On September 10, 1971, admittedly with some reluctance, I permitted Mr. Kalodner's third material amendment which increased his financing from $8,-000,000 to $9,500,000; in granting the request, I recognized that if I had not gone beyond the maximum ambit of my discretion, nevertheless I was at least tottering on the brink which terminates judicial discretion. Having granted Mr. Kalodner another material amendment and another day in court for the presentation of his evidence, nevertheless I find that his Third Plan is again not "worthy of consideration" for submission to the Securities and Exchange Commission. Further, I find that the Trustees' Plan, as amended, is not only "worthy of consideration," but it is also "fair, equitable and feasible" for immediate submission to the creditors pursuant to § 175 of the Bankruptcy Act, 11 U.S.C. § 575.

## II.

### THE KALODNER PLAN—IS IT WORTHY OF CONSIDERATION?

As previously noted, Mr. Kalodner has made a significant contribution to the evolvement of the Trustees' final plan for reorganization; for prior to the time he entered the stage, the Foreman-Snider Plan offered twenty percent to unsecured creditors and the ARA Services, Inc. (hereinafter referred to as "ARA") Plan made no offer to pay any amount to the unsecured creditors. After Mr. Kalodner's entrance, the Foreman-Snider group responded by offering one hundred percent to the unsecured creditors.[7] Yet, while Mr. Kalodner may have assisted the unsecured creditors by the stimulation of competition in the formu-

6. The Trustees have submitted a minor amendment (Docket No. 224) to their Plan to make clear that the Foreman mortgage was to be subordinated to the payment of the unsecured creditors; however, this amendment was probably not necessary since it had been clearly expressed as their intention. The language of the amendment was utilized to eliminate any ambiguities from the language used in an earlier proposal which increased the payment of unsecured creditors from twenty percent to one hundred percent.

7. Under the Trustees' Plan, the unsecured creditors will receive fifty percent of the value of their claims on consummation, with the remaining fifty percent to be paid in four equal annual installments in the four years following consummation of the Plan.

The Leonard Tose (Philadelphia Eagles Football Club) claim, as reduced to $250,-000 in an agreement approved by the Court, will be satisfied by payment of $50,000 at consummation, and the remaining balance by payment of five equal annual installments with interest, beginning at the end of the fifth year following consummation.

lation of reorganization plans, he is unable to now compete in the last act because he is short at least $600,000 before his plan could become worthy of consideration, even if all of the other contingencies of his plan come to fruition. (Exhibit K–102.)

In order to pay off the present indebtedness, Mr. Kalodner would need at least an additional $200,000; in addition it is estimated that one would need at least $400,000 of working capital for immediate repairs to the Spectrum and contingency funds. In addition to the shortage of $600,000 there are other uncertainties which might make the Kalodner Plan unworthy of consideration until such time as he has resolved those factors. As an example, his Plan is predicated on:

(1) Receiving a favorable ruling from the United States Internal Revenue Service that the proposed bonds to be issued will be tax exempt; and

(2) The Philadelphia City Council passing

(a) a bill (which is not vetoed by the Mayor) for the creation of the non-profit corporation which would issue the $9,500,000 bonds; and

(b) additional ordinances approving the proposed lease agreements.

These bills have not even yet been submitted to the City Council.

In order to pay the total indebtedness, the Kalodner Plan's survivability is contingent upon his ability to obtain a ruling that ARA must subordinate its present "A" Fund, a $600,000 third mortgage claim, to his proposed $9,500,000 bond issue. I find that as a matter of law, ARA cannot be compelled to subordinate their $600,000 "A" Fund third mortgage claim, and in fact, as secured creditors, it is entitled to have paid at consummation its "A" Fund claim and

its "B" Fund claim purportedly in the amount of $850,000.[7a]

The multifaceted attacks made by Mr. Kalodner on ARA's claims require the following extensive explanation of the background of the original ARA loans to Mr. Wolman and ARA's relationship to the debtor corporation and the Trustees.

The contract between Jerry Wolman and ARA arises from a Loan Agreement of July 27, 1966. Under that Agreement, ARA was obligated to make a two-part loan to Wolman totalling $2,126,300.00. The first part of the loan, the "A" Fund was advanced immediately and was to be repaid quarterly with interest on the unpaid balance. Under a Concession Agreement, it was provided that ARA could withhold from revenues otherwise due Wolman the sum of $8,333.33 per month in reduction of the principal of the "A" Fund. These withheld funds would be credited against the unpaid balance of the "A" Fund. Thus, the "A" Fund of $1,000,000 would have been repaid at the rate of $100,000 per year for ten years, plus interest.

The second part of the loan by ARA to Wolman was the "B" Fund which ultimately amounted to an indebtedness of $1,126,300.00. Loans were made in varying amounts. ARA advanced to Wolman $394,205 on August 19, 1966, and also on October 7, 1966. In addition, ARA advanced to Wolman $168,945 on November 1, 1966, and also on December 5, 1966. (Docket No. 218, Answer of ARA, p. 3; Docket No. 214, Exhibit A.)

The Loan Agreement specifies several events which would constitute a default, two of the most material of which were:

(1) If the borrowers failed to make any payment of principal or interest required within ten days after notice that the same was due (Loan Agreement, ¶ 9.A.); and

---

7(a). The Debtor seems to imply that the issue of whether ARA is required to subordinate its $600,000 "A" Fund claim is appropriate for adjudication only if summary judgment were granted in Debtor's favor, but Debtor asserts that before this Court could reject his contention that ARA must subordinate, a full evidentiary hearing must be held. I find that the Debtor has not proferred any material fact in dispute, and thus, the issue is now appropriate for final adjudication.

(2) If any default occurs as defined in paragraph 32 of the City-Wolman Lease, regardless of whether or not that default was later cured by Wolman pursuant to the lease (Loan Agreement, ¶ 9.C.).

Under paragraph 32 of the City-Wolman lease, one of the specified events of default was the placing of the borrower (Spectrum and/or Wolman) in involuntary bankruptcy. On May 1, 1968, ARA, along with other secured creditors, filed a petition placing the Spectrum into corporate reorganization. In addition to other "technical defaults" under the City-Spectrum lease, ARA asserts that when the Spectrum went into corporate reorganization, this act constituted a material default under paragraph 32 of the lease. The acceleration clause in paragraph 10 of the Loan Agreement provides:

> "Upon the occurrence of an Event of Default, . . . then forthwith upon written notice by Lender to Borrowers, all balances of principal and interest hereunder then remaining unpaid shall become due and payable . . . ."

Accordingly, ARA contends that the petition placing the Spectrum into involuntary bankruptcy filed on May 1, 1968, and its Proof of Claim of December 20, 1968, constituted the requisite notice under paragraph 10 of the Loan Agreement.

Under paragraph 13 of the Loan Agreement, the parties (ARA-Wolman) provided that the rights of the borrowers should not be assignable, except to a limited partnership of which Jerry Wolman was a general partner or otherwise with the written consent of the lender.

Under the 1966 Wolman-ARA Loan Agreement, it was contemplated that Wolman would require additional construction loan financing. In paragraph 11 of the Loan Agreement, the parties provided that additional financing, not to exceed $6,000,000 could be placed on the Spectrum, provided that any new mortgage must be of equal lien with the prior ARA loan. Fidelity Bank, in agreeing to loan an additional $5,500,000 to Wolman, required that its loan have a first mortgage on the Spectrum leasehold. In order to induce ARA to subordinate its original mortgage to the new Fidelity mortgage, Wolman executed an agreement whereby the Spectrum would asume all of Wolman's liabilities arising under the original 1966 Loan Agreement. The Assumption Agreement (Exhibit 2 to Docket No. 218) was not signed by ARA but was signed by the Spectrum Arena whereby the Spectrum agreed to assume all Wolman's liabilities under the ARA-Wolman Loan Agreement. Thus, through the Assumption Agreement, ARA was induced to subordinate its prior lien on the Spectrum leasehold.

ARA asserts with vigor that as a preferred creditor it is not required to subordinate and is entitled to have the entire amount due on both loans ("A" and "B" Funds) of $1,483,535.30, as of July 31, 1971, paid at consummation prior to the payment of any unsecured creditors. Further, ARA asserts that since it was not a party to the "assignment" between Wolman and the Spectrum, it is not obligated in any respect to the Spectrum as to subordination of any loans. If ARA is correct, at least as to the lack of any duty on the part of ARA to subordinate its loans which constituted the "A" Fund, then Mr. Kalodner is at least $200,000 short of funds to pay off the present indebtedness, and he has no funds available for working capital. (See p. 772, *supra.*)

Mr. Kalodner takes such diverse approaches to support his contentions that it is particularly essential for analytical purposes to distinguish two subsidiary issues.

(1) Even if there had been no defaults, would ARA be bound to subordinate its "A" Fund loan to a $10,000,000 first mortgage on the Debtor Corporation's leasehold. As noted above, the original July 27, 1966 Loan Agreement was between the Wolmans and ARA.

The Assumption Agreement was not signed by ARA. The issue is: Does the Spectrum have the same rights which Jerry Wolman would have had under the July 27, 1966 Loan Agreement. Or phrased differently, was the 1966 Loan Agreement assignable to the Spectrum and therefore enforceable now against ARA? If ARA is under no agreement to the Spectrum, then one does not have to explore whether a default ever occurred under the 1966 Loan Agreement.

(2) However, if under certain circumstances, ARA could be obligated to subordinate the "A" Fund loan, then the issue becomes whether the Spectrum materially breached the agreement or defaulted in such a manner where even if ARA were bound by the assignment, ARA would nonetheless have the right to now demand full payment of the indebtedness without any obligation to subordinate the "A" Fund loan.

### A.

As to the first issue, is there any agreement under which ARA, in some circumstances, could be bound to the Spectrum corporation?

■ The Debtor, represented by Mr. Kalodner, argues that ARA is required to subordinate its present "A" Fund third mortgage under paragraph 12 of the Loan Agreement to the new first mortgage bonds proposed under the Debtor's Plan. Mr. Kalodner states that the Assumption Agreement (Docket No. 218) as described above effectively constituted consent by ARA to the assignment by Wolman to the Spectrum of the Loan Agreement rights thereby giving the Spectrum (Debtor) the right to take advantage of the subordination right provided in paragraph 12 of the 1966 Loan Agreement. Under paragraph 13 of the July 27, 1966 Loan Agreement, ARA expressly limited its duty to loan money to Wolman himself or to a partnership which included Wolman. Mr. Kalodner argues that the Assumption Agreement of May 31, 1967 constituted the required express consent of ARA.

Because the Assumption Agreement was not signed by ARA and there is no indication that ARA or Wolman viewed the Assumption as a complete assignment, I find that the Assumption Agreement does not constitute the *express* consent required under paragraph 13 of the Loan Agreement.

■ Even though the Spectrum as currently organized does not include Wolman as a general partner, and this Court has found that there has been no *express* consent by ARA to any assignment, the actions of ARA subsequent to the May 31, 1967 Assumption Agreement have evidenced the desire of ARA to treat the Spectrum as the complete successor in interest to any rights which Wolman had to force ARA to subordinate. Thus, ARA has *impliedly* consented to deal with the Spectrum. In other words, *if* there were no defaults or breaches of the agreements in issue, ARA has effectively waived any right to now assert it would not now be bound to subordinate to a $10,000,000 bond issue of the Spectrum, just as it would have been bound to subordinate to a like bond issue of Wolman.

In conclusion, because of a combination of factors including, *inter alia*, ARA's continued dealing with the Spectrum under the Concession Agreement, originally entered into by Wolman and ARA, ARA is required to deal with the Spectrum in the same manner that it would have been required to deal with Wolman.

### B.

Having decided that the Spectrum has the same rights against ARA which Wolman would have had under the July 27, 1966 Loan Agreement, the next question before this Court is whether under that agreement there were Events of Default which have not been waived whereby ARA is no longer obligated to subordinate its loans and has the right to immediate payment as a secured creditor.

Under the Kalodner Plan, ARA would be required to subordinate its $600,000

"A" mortgage to newly proposed first mortgage bonds of $9,500,000. ARA has refused to allow its $600,000 "A" mortgage to continue and has taken the position that it is not legally required to subordinate its mortgage to the new bonds as ARA is no longer bound by the Loan Agreement it entered into with Jerry and Ann Wolman on July 27, 1966 which would require subordination. In asserting that ARA is still bound by the 1966 Loan Agreement, Mr. Kalodner states in paragraph 9 of his Petition to Disqualify ARA in Voting on Debtor's Plan of Reorganization (Docket No. 214) that (a) no Event of Default under paragraph 9 of the Loan Agreement occurred or exists; (b) even if there had been an Event of Default it has been waived by ARA's continued acceptance of payments of principal and interest due on the "A" Fund; and (c) ARA is estopped from asserting a default because it has retained all concession revenues since May 1, 1968, the date this Bankruptcy Petition was filed. Under Mr. Kalodner's theory, ARA must subordinate its "A" Fund claim to his proposed $9,500,000 bond issue.

ARA's position is that (1) the entire balance of principal and interest is due under the July 27, 1966 Loan Agreement as an Event of Default has occurred; and (2) there is no basis for estoppel or waiver.

■ Under paragraph 9(c) of the ARA-Wolman Loan Agreement, any default under the Wolman-City of Philadelphia Lease constitutes a default under the Loan Agreement as defined in paragraph 32(c) of the Lease Agreement. Paragraph 32(c) states that the filing of a petition in bankruptcy against the tenant (Spectrum) shall constitute a default. On May 1, 1968, ARA along with other secured creditors filed a petition placing the Spectrum, Inc., into corporate reorganization under Chapter X. It should be noted that under paragraph 9(c) and under "Recitals 2" of the Loan Agreement, ARA is given rights independent of those of the City. Thus, any argument that the City has agreed to waive all the lease defaults would not bind ARA. Further, by filing the Petition in Bankrupcty, ARA is not precluded under the July 27, 1966 Loan Agreement from claiming that the Debtor is in default. In addition, there is no provision for any curing of defaults except with the written consent of the lender (ARA), and there is no argument that ARA has so consented.

■ Under paragraph 10 of the Loan Agreement, an occurrence of an Event of Default causes the whole of the debt to be immediately due and payable.[8] I reject the contention that the filing of the Petition in Bankruptcy was insufficient notice to the lender as required under paragraph 10. Further, the filing of ARA's proof of claim on December 20, 1968, is also deemed to be sufficient notice under paragraph 10 that ARA demanded payment of the entire balance. In addition, as of today, the "B" Fund is still allegedly delinquent in the amount of $858,827.38[9] and there is a balance of about $600,000 on the "A" Fund. Thus, even were the argument accepted that ARA is bound to accept a curing of a default under the Loan Agreement, such default has not yet been cured under 9(a) of the Loan Agreement.

I find that Events of Default have occurred under the July 27, 1966 Loan Agreement. Mr. Kalodner then urges in the alternative that, even assuming that a default occurred, ARA has waived its rights to claim the benefit of any such default because of ARA's continued acceptance of payments on account of both the "A" and "B" Funds by reason of ARA's withholding all concession revenues under the Wolman-ARA Concession Agreement. Thus, Mr. Kalodner asserts that ARA by continuing to act under the defaulted Loan Agreement is bound by its waiver and cannot now assert the invalidity of that agreement.

---

8. See p. 774, supra.

9. Trustees' Seventeenth Report, Schedule I, July 31, 1971, (Docket No. 232).

ARA takes the position that it has not waived its right to establish a default under the Loan Agreement. Rather, ARA states that by withholding all revenues under the Concession Agreement, it was merely exercising its right of set-off and was thereby treating the whole of the "A" and "B" Funds as then due pursuant to the acceleration clause in paragraph 10 of the Loan Agreement.

I find that ARA has not waived its rights and is therefore legally free to treat the Loan Agreement as being in default. There is no claim made that ARA *expressly* waived its rights; in fact, the record in this case shows that on December 20, 1968, ARA filed a proof of claim stating the entire balance of the "A" and "B" Funds as then due and payable. Further, the concept of express waiver assumes a definite manifestation of intent to so waive. Here to hold that by withholding concession revenues, ARA expressly waived its rights is to ignore the record.

■■ Secondly, it cannot be maintained that ARA *impliedly* waived its rights. An implied waiver could be found if ARA had continued to withhold revenues after some objection by the parties affected by the withheld Concession Agreement funds. Here the record does not indicate that the Trustees objected to ARA's action and that ARA then continued to withhold the funds over objection. The only remaining party affected by ARA's action was the holder of the first and second mortgages on the Spectrum, the Fidelity Bank. Fidelity Bank does not object to ARA's continued withholding of funds, while at the same time reserving any rights to object at a later date. (Fidelity letter, Docket No. 230). This Court makes no finding that the withdrawal of funds [10] as to the "B" Fund was or was not improper. If Fidelity Bank objects on the record as to the acts of ARA, this Court will avoid prejudice to Fidelity even if it must require ARA to pay back funds withheld. However, at this point in the proceedings there is no harm to the shareholders, unsecured creditors or the fourth mortgage holder. Thus, with no potential harm to anyone except Fidelity and no objection from Fidelity, I find that ARA has not waived its rights to be free from the July 27, 1966 Loan Agreement.

### C.

■ Finally, Mr. Kalodner asserts that even if no Events of Default occurred and there is no waiver, ARA is nonetheless *estopped* to deny the vitality of the Loan Agreement. No estoppel arises when the conduct assigned as a ground for estoppel was not relied upon or was not the cause of a change in position. P.L.E. Estoppel §§ 23, 24; see also, Sabino v. Junio, 441 Pa. 222, 272 A.2d 508, 510 (1971). Here, there is no reliance by or injury to the Debtor and no acts inconsistent with ARA's position that the Loan Agreement is in default. Thus, I find that ARA is not estopped from asserting the invalidity of the Loan Agreement.

■ In conclusion, I find that (1) ARA has waived its right to withhold its consent to the assignment to the Debtor of any rights requiring it to subordinate its "A" Fund loan; (2) Events of Default have occurred under the Loan Agreement; (3) ARA has not expressly or impliedly waived its right to assert those defaults; and (4) ARA has not done any acts creating an estoppel. Thus, ARA is not bound to subordinate its "A" Fund mortgage to the new first mortgage bonds required by the Debtor's Plan.

---

10. The doctrine of set-off is provided for in 11 U.S.C. § 108 which provides, in part, that mutual debts or mutual credits between the estate of a bankrupt and a creditor . . . shall be set-off against each other. However, funds which come into the possession of the debtor after the filing of the petition in bankruptcy, are not normally the subject of a set-off. Because ARA has guaranteed to Fidelity the repayment of any funds improperly withheld, we reserve any decision on the alleged set-off issue. (Docket No. 230.)

### D.

Having found that ARA is not bound to subordinate its "A" Fund mortgage to the $9,500,000 bond issue proposed by the Debtor, the next issue is whether the Kalodner Plan, as amended, is "worthy of consideration" for submission to the SEC pursuant to § 172 of the Bankruptcy Act, 11 U.S.C. § 572. At oral argument on September 24, 1971, Mr. Kalodner stated the following in response to a question from the Bench:

"THE COURT: [In] . . . the joint memorandum of trustees and Foreman-Snider re Kalodner Third amended plan. . . . They allege that the plan as proposed by the debtor if ARA is not bound to accept your proposal for subordination to the $9.5 million loan that you would be short of funds exclusive of working capital of approximately $200,000.

Is that statement accurate or inaccurate if ARA is not obligated to subordinate its mortgage?

"MR. KALODNER: I think that is accurate, sir. I mean without passing on whether the dollars are precisely accurate, I think it is roughly accurate.

"THE COURT: It is in the $200,000 range?

"MR. KALODNER: Yes, roughly that."

(N.T., Sept. 24, 1971, pp. 20–21.)

The shortage of $200,000 in the Debtor's Plan plus the further unavailability of any working capital or contingency reserves constitute fatal flaws in the Kalodner Plan. His Plan assumes the feasibility of a $9,500,000 bond issue. Bache & Company's opinion that bonds in the amount of $9,500,000 could be sold in support of the Debtor's Plan was based on a significant change in Mr. Kalodner's estimate of projected income. Where under the former $8,000,000 bond issue, he was assuming $1,200,000 in net annual operating income, the new $9,-500,000 bond issue requires, at a minimum, net annual income of $1,400,000. This new estimate of $1,400,000 income was based on the already disproven assumption that there would be a significant increase in the price of the hockey tickets (Philadelphia Flyers); yet that assumption was precluded by the "price freeze" pursuant to President Nixon's August 15, 1971 Executive Order. In addition, Mr. Kalodner assumed increases in revenues from roller derbies and "rock" concerts. Even with these highly speculative assumptions of increases in income, Mr. Kalodner's Plan nevertheless would be short, *ab initio*, $200,000; as a result, the unsecured creditors would receive $200,000 less at consummation. Consequently, he could not fulfill even his first promise to pay the unsecured creditors fifty percent of their claims on consummation.

Of equal significance, the Record in this case demonstrates that significant capital improvements to the Spectrum are urgently needed, especially to the vital ice compressor unit. Since the Debtor's Plan fails to provide even one cent for working capital, if it is to meet those urgent capital improvement needs, the only other source available would be operating income. Accordingly, under Mr. Kalodner's Plan, the Spectrum would not only have started out in an insolvent position, but it would be unable to meet its bond obligations because money from operating income would have to be diverted to needed capital improvements.

In summary, Mr. Kalodner's proposal is one in which the Debtor starts out an insolvent corporation and would remain an insolvent corporation. If a court were unwise enough to approve his Plan, it is as certain as the fact that night follows day that the Spectrum, within a few months, would be in the throes of another corporate reorganization. Or if he failed to make the needed capital improvements, the safety of the building, and its capacity to maximize its future income would be drastically reduced. Another corporate reorganization would be necessitated by the early defaults on the newly issued bonds and the claims of new creditors. Of course there is no certainty that a second cor-

porate reorganization would meet with the success which the present one has. More important, why should the unsecured creditors and the public have to be subjected to such an unnecessary contingency—when there is a Plan as noted below which starts out solvent, which has a high probability of continuing to remain solvent and which will make the Arena a successful, viable entity for the citizens of Philadelphia.

In the most classic sense, the Kalodner proposal is a perfect exemplification of unfeasibility and of a lack of a "reasonable probability of financial stability and success." (See, discussion, p. 780, *infra*.) For the above reasons, I find that the Kalodner Third Amended Plan as a whole is clearly not "worthy of consideration" and should not be submitted to the SEC for review.

## II.

### TRUSTEES' PLAN—FAIR, EQUITABLE AND FEASIBLE.

In my Opinion of August 31, 1971, I ruled that the Trustees' Plan, as amended and modified, was "worthy of consideration", and it was submitted to the SEC for "an advisory report on said Plan or a statement that it (SEC) will not file a report.[11]" Through their Assistant Director, Mr. Bernard Wexler, the SEC replied:

"The Commission has authorized me to state that since it did not participate in this Chapter X proceeding because of the absence of any public investment therein, it will not comment on the plan of reorganization that you have referred to it, pursuant to Section 172 of the Bankruptcy Act.

". . . In view of your careful opinion of August 31, 1971, I doubt that an advisory report from this agency would yield a benefit great enough to warrant the delay in the proceedings that would be required in

order to give the Commission and its staff an opportunity to analyze the voluminous record and the conflicting contentions that the parties have made before you." (Docket No. 219.)

Having received notice that the SEC will not file a report, I must now determine whether the only plan which I found to be "worthy of consideration", the Trustees'-Foreman-Snider Plan, is "fair and equitable, and feasible" and therefore proper for submission to the creditors pursuant to § 174 of the Bankruptcy Act, 11 U.S.C. § 574.

### A.

*Insolvency of the Debtor Corporation.*

No provision is made in the Trustees' Plan for compensating the shareholders, and by reason of insolvency of the Debtor corporation no compensation to stockholders is required pursuant to § 216(8) of the Bankruptcy Act, 11 U.S.C. § 616(8).[12] My prior finding of insolvency is again reaffirmed, and it is based on a capitalization of future earnings of the Spectrum. As the Supreme Court stated in Consolidated Rock Products v. DuBois, 312 U.S. 510, 526, 61 S.Ct. 675, 685, 85 L.Ed. 982 (1941):

"The criterion of earning capacity is the essential one. . . ."

Also, in a recent case, In re Muskegon Motor Specialities, 366 F.2d 522, 526 (6th Cir. 1966) the Court reaffirmed this principle stating that: "a finding of insolvency is arrived at by a comparison of assets (here being the capitalized value of future earnings) with liabilities."[13]

The Spectrum was the subject of a July 27, 1971 appraisal by the Jackson-Cross Company which set the value of the leasehold interest at $7,350,000 on the assumption that the leasehold interest would not be subject to real estate taxes. This valuation was developed by capitalizing the future income of the

---

11. 340 F.Supp. 755 (E.D.Pa., 1971), Opinion of August 31, 1971, p. 767.

12. 340 F.Supp. 755 (E.D.Pa., 1971), Opinion of August 31, 1971, pp. 765–767.

13. 6A Colliers, ¶ 11.05, 594–595.

Spectrum as a "going concern" as required by law. (Jackson-Cross Report, p. 20; see p. 781, *infra.*) I find that the Jackson-Cross Report is credible and I adopt it for my findings of fact.

It should be noted that in the Trustees' Seventeenth Report (Docket No. 232) of July 31, 1971, they place the value of property, plant and equipment, including the leasehold interest at $7,738,-225.58. In addition, the Report notes current and other assets of $1,852,125.10, for total assets of $9,590,350.68. The Report shows Liabilities of $12,829,111.-56. Thus, the Stockholders' "Equity" was a deficit of $3,239,760.88.[14] (Capital stock is valued at $1,000.)

The Trustees have carried as a current liability the accrued real estate taxes which as of July 31, 1971, amounted to $1,025,551.60. By reason of my Opinion of August 9, 1971, that the leasehold interest of the Spectrum was not subject to Philadelphia real estate taxes, most, if not all, of this liability can be eliminated. Still, the Debtor corporation would be left with a deficit of $2,214,209.28. This decrease in the deficit does not eliminate the indisputable insolvency of the Debtor. There was no credible evidence presented which could support, even inferentially, a finding of solvency. It is intriguing that the experienced counsel for the Debtor, Mr. Kalodner, failed to put on any expert to corroborate his allegation of solvency. Rather, he pursued his case by making trivial and peripheral challenges to the report of the experts from the Jackson-Cross Company. Is it asking too much for someone who wants to sell to the public $9,-500,000 worth of bonds to present even one expert who will testify as to the value of the lease-hold? Adroit cross-examination on peripheral issues is not a substitute for a sound, economic presentation based on market value data by a recognized and scholarly appraiser. The more than $2,000,000 deficit in Stockholders' "Equity" supports my finding of insolvency.

When Mr. Kalodner acquired the Debtor's stock from Jerry Wolman, no consideration passed to Wolman except a future promise to pay *if anything were realized* by Kalodner on the stock. In Wolman's own proceedings for an arrangement under Chapter XI of the Bankruptcy Act, in the United States District Court for the District of Maryland (Case No. 13072), on December 8, 1969, a stipulation was filed by and among Debtors, Creditors' Committee and the Fidelity Bank which provided, *inter alia,* as follows:

> "*Debtors and the Committee hereby agree that Spectrum is insolvent and consent to a finding that the stock of Spectrum owned by the Debtors is valueless.* Furthermore, Debtors and Committee agree that the Debtors have no other interest of any kind in Spectrum or the proceeds thereof." (Emphasis added.) (Docket Entry No. 166, Exhibit L, p. 2, hereinafter referred to as D.E. 166, Ex. L, p. 2.)

This stipulation is further evidence of the Spectrum's insolvency as to the stock.

### B.

### FAIR AND EQUITABLE

In order for a Plan to be "fair and equitable," it must meet the absolute priority test, that is, it must provide "participation for claims and interests in complete recognition of their strict priorities . . ."[15] In other words, ". . . each class in descending rank must receive full and complete compensation . . . before the next class below may properly participate."[16] The

---

14. The Trustees' Sixteenth Report of April 30, 1971, shows the Stockholders' "Equity" as a deficit of $3,155,204.18. The audited report by Haskins and Sells notes that on May 1, 1968, when the Debtor went into reorganization, the deficit was approximately $1,862,000. Thus, when the Debtor went into reorganiza-tion, it was insolvent, and it is still insolvent as to the Stockholders' Equity".

15. 6A Colliers, ¶ 11.06, at 613; Case v. Los Angeles Lumber Products, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939).

16. 6A Colliers, ¶ 11.06, at 614.

Supreme Court has further held that the absolute priority rule applies to insolvent corporations.[17]

■ Under the Trustees' Plan of Reorganization, the holder of the first and second mortgages on the Spectrum, Fidelity, is to be paid in full with interest of 7.5%. In a letter dated September 27, 1971 (Docket No. 228), Fidelity Bank took the position that in Fidelity's judgment, December 31, 1971, is the latest date to which Fidelity would agree for full payment of it secured claims without exercising its default rate of interest. Further, Fidelity has agreed that conditioned on such payments actually being received on or before December 31, 1971, it will (1) waive any claim to the "default" interest of ten percent; (2) compute its final interest claim only on principal, and not on principal and previously accrued but unpaid interest; and (3) claim only fifty percent of its total out-of-pocket charges, costs and expenses as of the date of payment. The holder of the third mortgage, ARA, will release its third mortgage claim and be paid in full subject to its agreement with Foreman-Snider to loan the new corporation $1,400,000. The Foreman fourth mortgage claim will be satisfied by the issuance of shares of stock in the new company or be wholly subordinated both to all debt incurred in financing the new company and to the claims of the present unsecured creditors. The claims of the unsecured creditors shall be paid in full as follows:

(1) Fifty percent (50%) to all unsecured creditors (except Leonard Tose) upon consummation;

(2) The balance (except Tose) in four annual equal installments;

(3) The Tose claim, as reduced to $250,000 in agreement approved by the Court, will be paid $50,000 at consummation and the balance in five annual equal installments beginning at the end of the fifth year following consummation.

All administrative costs, taxes (other than real estate taxes),[18] and valid mechanic's lien claims shall be paid in full. No provision is made for stockholders by reason of the Spectrum's insolvency.[19] As the above analysis indicates, there is no question that the Plan as proposed satisfies the "absolute priority" rule. Therefore, I find that the Plan is "fair and equitable."

## C.

## FEASIBILITY

■ In addition to finding that the proposed Plan is "fair and equitable," § 174 of the Bankruptcy Act, 11 U.S.C. § 574, also requires a Court to determine whether or not the Plan is "feasible". "Basically, feasibility involves the question of the emergence of the reorganized debtor in a solvent condition and with reasonable [probability] of financial stability and success."[20] Under the Trustees' Plan, there exists a total of $11,032,000 to be refinanced on December 31, 1971. (Brief for Foreman-Snider, Docket No. 194, p. 8). To meet the above cash requirement, the Trustees' Plan proposes the following:

(1) The First Pennsylvania Bank has agreed to lend $6,500,000, payable over fifteen years at 7.5% per annum (Ex. F–S 1);

(2) ARA has agreed to lend $1,400,000 payable over twenty years at a rate ½% over prime (Ex. F–S 3); and

(3) The Foreman fourth mortgage claim will be contributed to the new company, either by subordination or capitalization in exchange for stock in the new company.

In addition, the Trustees will have funds available in the bank and in the

---

17. Consolidated Rock Products v. DuBois, 312 U.S. 510, 527, 61 S.Ct. 675, 85 L.Ed. 982 (1941).

18. By my Slip Opinion of August 9, 1971, I held that the Spectrum leasehold was not subject to City of Philadelphia real estate taxes.

19. See, pp. 778–779, *supra.*

20. 6A Colliers, ¶ 11.07, at 638.

accounts receivable. Finally, the First Pennsylvania Bank has agreed to extend a $500,000 line of credit on a guarantee by Foreman, Snider and their wives, at an interest rate of 1¾% over prime to meet any deficit or to finance any needed capital or other improvements. Also, it should be noted that Mr. Foreman and Mr. Snider have agreed to devote their personal resources to whatever extent is necessary. (Hearing before Higginbotham, J., July 23, 1971, N.T., 98.)

To view the situation from the prospective of cash flow, I accept the Jackson-Cross estimate of annual cash flow of $1,000,000.[21] As deductions against this $1,000,000, there would be debt service to First Pennsylvania of $723,000, debt service to ARA of $150,000, payments to unsecured creditors of $55,500, and interest to Tose of $12,000 for a total of $940,500, leaving a balance of $59,500. Thus, from any point of view the Plan has the "reasonable expectation of success" which the statutory test of feasibility requires.[22]

Accordingly, I find, pursuant to § 174 of the Bankruptcy Act, 11 U.S.C. § 574, that the Trustees' Plan is "feasible." Therefore, having determined (1) that the Plan is "fair and equitable, and feasible", the only question remaining under § 174 of the Bankruptcy Act, 11 U.S.C. § 574, is whether the Plan meets the requirements of § 216 of the Bankruptcy Act, 11 U.S.C. § 616.

### IV.

Following the mandate of § 174 of the Bankruptcy Act, 11 U.S.C. § 574, I hereby find that the Trustees' Plan meets the requirements of § 216 of the Bankruptcy Act. Mr. Kalodner has made ten objections to approval of the Plan under § 216 which are dismissed for the following reasons, *inter alia:*

(1) All creditors or shareholders are affected by the Plan, and the Plan specifies how the rights of creditors and shareholders are altered, §§ 216(1), 216 (6), Plan, ¶¶ I, VI;

(2) The Plan deals with all property of the Debtor and passes all property to the new company, (§ 216(2)), Plan, ¶ II;

(3) The Plan provides for the payment of all costs and expenses of administration (§ 216(3)), Plan, ¶ 3;

(4) The Plan rejects no executory contracts, (§ 216(4)), Plan, ¶ IV;

(5) The Plan specifies which claims are to be paid in cash in full (§ 216(5)), Plan, ¶ V;

(6) The Plan provides that any class of creditors which is affected by and does not accept the Plan will receive adequate protection under one of the methods provided in § 216(7) of the Bankruptcy Act, Plan, ¶ VII;

(7) The Plan makes no provision for shareholders by reason of this Court's finding of insolvency, § 216(8), Plan, ¶ VIII;

(8) The Plan provides the means for execution of the Plan, § 216(10), Plan, ¶ IX;

(9) The Plan provides that directors and officers of the new company will be elected by shareholders and approved by the Court on consummation, § 216 (11), Plan, ¶ X; and

(10) The Plan lists the mandatory provisions to be included in the Charter

---

21. While admittedly the $1,000,000 figure would not be categorized as excessively liberal, it appears to be sufficiently rational for my adoption. I certainly reject Mr. Kalodner's new optimism that the contemplated operating income would be $1,400,000. I cannot help but believe that the latter optimism has been engendered not by the evidence, but by the mathematics, which would require that Mr. Kalodner raise an additional $1,500,-000 from his bond issue, thereby requiring annual income of $1,400,000. Even if the Jackson-Cross estimate of $1,000,000 annual income were rejected in favor of a $1,200,000 cash flow, the Debtor corporation would still be insolvent, and the $1,200,000 estimate is neither sufficient to eliminate the present insolvency of the Debtor corporation, nor is it adequate to make Mr. Kalodner's Plan "worthy of consideration."

22. 6A Colliers, ¶ 11.07, at 638.

of the new company, § 216(12), Plan, ¶ XI.

The Plan as proposed was subject to two conditions:

(1) A settlement of claim for real estate taxes due the City of Philadelphia and the School District of Philadelphia, and

(2) That the City of Philadelphia (as it has agreed to do) waives and declares cured all defaults claimed to exist under the Construction and Lease Agreement of May 26, 1966. The City of Philadelphia has waived all those defaults (N.T., pp. 72–76, July 23, 1971), and by my Opinion of August 9, 1971, I have removed the first condition.

Although this Court has by this Opinion found pursuant to § 174 of the Bankruptcy Act, 11 U.S.C. § 574, that the Trustees' Plan is "fair and equitable," and "feasible" and meets the requirements of § 216, 11 U.S.C. § 616, it is necessary before entering an order submitting the Plan to the creditors, to consider Mr. Kalodner's objections to the Trustees' Proposed Order approving the Foreman-Snider Plan, Plan and Summary of Plan, and Letter of Transmittal. (Docket No. 222.) Mr. Kalodner's nine objections will be considered seriatim:

(1) At all times Debtor was aware that the Court was considering a plan of reorganization pursuant to § 216(11 U.S.C. § 616). Section 216(8) (11 U.S.C. § 616(8)) specifically provides that the plan must provide for any class of stockholders where the corporation is solvent and notes:

"Provided, however, That such protection shall not be required if the judge shall determine that the debtor is insolvent."

Thus, at all of the prior evidentiary hearings, the Debtor was necessarily on notice that inherently one of the issues would be Debtor's solvency. For a Court could never make a determination on whether a plan is "fair and equitable" or on its "worthiness for consideration" without determining the solvency issue. The absence of purported evidence which would allegedly support solvency is attributable solely to the Debtor's failure to present such data.

(2) The one hundred percent (100%) payment to creditors represents more than they could realize in a bankruptcy liquidation.

(3) The Court is of the opinion that the issues raised in the Petition for an Accounting of ARA (Docket No. 217) do not bear on the issues discussed in this Opinion.[23]

(4) The Court has today explained and documented its findings that the Plan is "fair and equitable," and "feasible".

(5) The Court finds that the general objection in ¶ 5 of Mr. Kalodner's Petition raises no legal issues which remain unanswered.

(6) The Court finds that the requested information is not required by the express language of § 216 of the Bankruptcy Act, 11 U.S.C. § 616.

(7) The Trustees' Amendment to Plan (Docket No. 224) responds to and cures the objection that it is not clear that the Foreman mortgage is to be subordinated. (*Supra,* p. 771.)

(8) As to Mr. Kalodner's objection that the Trustees' Plan does not "prevent the reorganized corporation from borrowing substantial additional funds and giving security therefor so as effectively to subordinate existing creditors to an unlimited amount of prior debt," I would approve any order which provided that no debts, other than the proposed First Pennsylvania Company mortgage and line of credit and the proposed ARA loan, would be senior to the instant unsecured creditors' claims. If this plan is approved by the creditors, such form of

23. Argument on the ARA Motion to Dismiss the Petition for an Accounting of ARA is hereby scheduled for November 12, 1971, at 3:30 P.M. The Brief of ARA will be due November 4, 1971, and the Reply Brief of Mr. Kalodner will be due November 11, 1971.

order should be submitted, if at all, at the confirmation hearing.

(9) There is no requirement that the officers and directors of the new company be revealed prior to confirmation.

Therefore, this Court finds that the Debtor's objections to the Plan are without merit and Debtor's objections are dismissed and Debtor's requested relief is hereby denied.

This Opinion, filed pursuant to Rule 52(a) of the Federal Rules of Civil Procedure (28 U.S.C. Rule 52(a)), constitutes the prerequisite findings of fact and conclusions of law for my findings that the Kalodner Plan, as amended, is not "worthy of consideration," that the Trustees' Plan is both "worthy of consideration" and "fair and equitable, and feasible", that the Trustees' Plan meets the requirements of § 216 of the Bankruptcy Act, 28 U.S.C. § 616, that the Spectrum is insolvent, and that ARA is not bound to subordinate its present third mortgage claim to the bond issue proposed by Mr. Kalodner on behalf of the Debtor.

## V.

## THE NECESSITY FOR A PROMPT DECISION BY CREDITORS

Thus, after three years it appears that there is a high probability that by December 31, 1971, the last curtain could be called on the present reorganization of the Spectrum. These years have been experiences which were always challenging to all parties concerned, occasionally exhilarating (as an example when the annual financial income was increased the last fiscal year by one-half million dollars), but most often frustrating (as an example when portions of the roof blew off on two occasions and the insurance company persistently threatened to cancel its policy). Although on Broadway the backers may seek a record for the longest continued performance, in corporate reorganization an unending tenure of trusteeship may indicate a financial disaster rather than a financial success.

If the Trustees' present Plan is accepted, some favorable comment must be made about the important role which Fidelity Bank has exercised in making the instant Plan possible. Fidelity Bank has made a significant gesture to the citizens of Philadelphia by its willingness to accept an immediate total payment of all claims at a rate of interest of seven and one-half percent—rather than waiting for a potentially larger amount over a protracted period in the future at a default rate of interest of ten percent. This concession means that there will be $500,000 more available now for payment of unsecured creditors; without Fidelity's waiver, the unsecured creditors would *not* be paid in full unless the present purchase price was increased by $500,000.00. Similarly, the First Pennsylvania Company has agreed to a first mortgage at a relatively low interest rate —again with apparent concern that the Spectrum become a viable financial entity to serve its public purpose.

I urge the creditors to review this matter with a strong sense of reality by recognizing that endless protracted delays may mean that neither their interest nor the public's interest will be benefitted. Fidelity Bank, as a profit-making institution, cannot be required to grant endless concessions on a debt which already is three and one-half years overdue.

If he could fulfill all of the questionable contingencies, Mr. Kalodner's proposed Plan theoretically might someday bring in additional revenue to the City of Philadelphia. Yet the very contingencies of his Plan may cause such interminable delays that there may never be evolved another plan which pays 100% to the unsecured creditors. Of course, it is easy to design a plan on paper envisioning a bountiful return to the City of Philadelphia some distant years in the future, but the Kalodner Plan fails in dealing with the economic realities of *today* as to his actual capacity now to have the necessary money to pay off the unsecured creditors and to provide *immediate* and essential working capital.

Mr. Kalodner contends that his Plan is more equitable because of the potential financial benefits which could theoretically accrue someday to the City of Philadelphia. Yet it should not be forgotten that he and the City fathers were originally content with the fairness of the *present* lease which will be implemented by the Trustees' Plan, and the present lease was drafted in part by Mr. Kalodner himself when he represented Jerry Wolman. I hope that by December 31, 1971, the Trustees will be able to close the final curtain on their management of the Spectrum so that the just debts of the past can be paid.